BARMASTERS BARTENDING SCHOOL, INC., Eugene McIlvaine and Pegi McGowan, Individually and t/a Philadelphia School of Bartending

v.

AUTHENTIC BARTENDING SCHOOL, INC., Joann Connor, Steven T. Klein and With A Twist, Inc.

No. 96–CV–2450.

United States District Court, E.D. Pennsylvania.

June 12, 1996.

Thomas S. McNamara, Indik & McNamara, Philadelphia, PA, for Plaintiffs.

Samuel Glantz, Levittown, PA, for Defendants.

## MEMORANDUM

JOYNER, Judge.

Plaintiffs Barmasters Bartending School, Inc., Eugene McIlvaine and Pegi McGowan, individually and t/a Philadelphia School of Bartending have sued Defendants Authentic Bartending School, Inc., Joann Connor, Steven T. Klein and With a Twist, Inc. under the Lanham Act, 15 U.S.C. § 1125(a) for false designation of origin and false or misleading representations of fact. Claims under Pennsylvania's common law have also been asserted for unfair competition, intentional interference with prospective business relations, breach of contract and civil conspiracy.

The action requests preliminary and permanent injunctive relief. This Court held a hearing on May 9, 1996 and has received proposed findings of fact and conclusions of law from the parties. The parties did not request transcripts and so there are no citations to the record in the following findings of fact.

## FINDINGS OF FACT

*The Parties*

1. Plaintiff Barmasters Bartending School, Inc. ("Barmasters"), is a Pennsylvania corporation with its principal place of business at 10050 Roosevelt Boulevard, Philadelphia, PA 19116.

2. Plaintiffs Eugene McIlvaine and Pegi McGowan, individually and trading as the Philadelphia School of Bartending ("PSB"), maintain their offices at 10050 Roosevelt Boulevard, Philadelphia, PA 19116.

3. Defendant Authentic Bartending School, Inc. ("Authentic"), is a Pennsylvania corporation with a place of business at 11600 Roosevelt Boulevard, Philadelphia, PA 19116.

4. Defendant Joann Connor resides in Levittown, PA. Defendant Steven Klein resides in Philadelphia, PA.

5. Defendant With a Twist, Inc., is a New Jersey corporation with its principal place of business at 300 C Plainfield Avenue, Edison, NJ 08817.

6. Non-defendant Without a Twist is a New Jersey corporation with its principal place of business in Paramus, NJ.

*The Parties' Businesses*

7. Since 1980, PSB has been in the business of operating bartending schools at various locations in Southern New Jersey and the Philadelphia area.

8. Since 1991, Barmasters has been in the business of operating bartending trade schools and licensing others, through franchises, to operate bartending trade schools using the system developed by PSB.

9. Since Barmasters was organized, PSB has been treated as a de facto franchise of Barmasters. In exchange for Barmasters's de facto license to PSB for the right to use the Barmasters trademarks and trade names without the normal franchise fee, PSB has given Barmasters the right to use, license and market its distinctive and unique instructional methods, programs, techniques, materials, methods of operation and marketing and promotional methods.

10. Barmasters and PSB maintain their principal places of business at the same location. Many corporate formalities are not observed by these closely held companies.

11. The original shareholders in Barmasters were McIlvaine and William Cahill, each of whom owned 50 of the 100 shares of outstanding common stock. In late 1995 or early 1996, Cahill sold and transferred all of his stock back to Barmasters for the nominal price of $1.00.

12. PSB is owned by McIlvaine and his wife, McGowan.

*Relationship Between the Parties*

13. In early 1992, Connor and a third party entered into discussions with McIlvaine and Cahill about investing in Barmasters and/or acquiring Barmasters franchises.

14. As part of those discussions, McIlvaine hired Connor to assist with the management and operation of PSB so that she could familiarize herself with the Barmasters system and could assist in marketing Barmasters franchises.

15. In June, 1992, Connor became a shareholder of Barmasters when McIlvaine and Cahill each surrendered five of their shares and Connor paid $10,000 to receive them. Connor remains a Barmasters shareholder to this day.

*1. Contractual Agreements*

*A. Shareholders' Agreement*

16. In connection with Connor's stock purchase, she executed a Shareholders' Agreement. Section 4 of that Agreement states that:

4. Joann Connor will be allowed to open three (3) franchised Barmasters locations at places and locations approved by the company without paying the initial fee required of all franchisees, but Ms. Connor will have to pay the standard ongoing Barmasters franchise fee required by the company of franchisees at the time she opens each location. No location will be opened within fifty (50) miles of any other Barmasters location without a written authorization to do so signed by Mr. McIlvaine and Mr. Cahill.

*B. Franchise Agreement*

17. In 1991, Barmasters created a form Franchise Agreement and has used only that agreement with its franchisees since then.

18. Connor had read, reviewed and understood the Franchise Agreement before she entered into the Shareholders' Agreement. She had attempted to negotiate certain provisions of the Franchise Agreement, but those negotiations were unsuccessful.

19. The weight of the evidence supports a conclusion that the standard Franchise

Agreement's terms and conditions were incorporated by necessary implication into the Shareholders' Agreement and that therefore, Connor is bound by the Franchise Agreement with respect to the franchises she opened under the Shareholders' Agreement even though she never formally executed a Franchise Agreement.

20. Section 18 of the Franchise Agreement reads:

COVENANT NOT TO COMPETE

During the term of the Franchise Agreement, Franchisee may not directly or indirectly engage in a business providing to the consuming public any courses or programs similar to those offered by Barmasters or its Franchisees. For a period of eighteen (18) months following termination of the Franchise Agreement, Franchisee may not directly or indirectly engage in any such business within ten (10) miles of his location nor within ten (10) miles of any Barmasters Franchisee or Company operation.

### C. Confidentiality Agreement

21. McIlvaine testified that every Barmasters's employee was required to sign a Confidentiality Agreement. These Agreements were stored together in a file in the Barmasters offices, to which Connor and others had full access. This entire file of papers is now missing and has been since an undetermined date.

22. The evidence proved that Connor signed a Confidentiality Agreement. Connor's denial of this was not credible given the testimony of two uninterested witnesses, one of whom witnessed Connor execute a document that Connor claimed was the Confidentiality Agreement.

23. McIlvaine testified that Klein personally handed an executed Confidentiality Agreement to McIlvaine. We find that McIlvaine's testimony that Klein executed a Confidentiality Agreement is more credible than any evidence to the contrary.

24. The Confidentiality Agreement reads, in pertinent part:

[I]n any event the Associate is for any reason no longer associated with Bar Masters, he will absolutely not engage, for a period of two years, either directly or indirectly, as owner, partner, distributor, broker, advisor, consultant, salesman, employee, teacher, instructor, director or any other capacity, in any similar type of school[,] business or activity within forty-five miles of the location of the Bar Masters School [in] which he was employed.

### 2. The Edison School

25. Even after Connor became a shareholder of Barmasters, Connor continued to work for PSB in Philadelphia and continued to assist Barmasters's efforts to market Barmasters franchises.

26. In April, 1993, Connor organized With a Twist to enable her to raise the money she needed to open a Barmasters location in Edison, New Jersey. With a Twist's shareholders were Connor, Klein, Cahill and a fourth person.

27. The Edison Barmasters school was intended to be and actually was one of the three franchises Connor was permitted to own pursuant to the Shareholders Agreement. Testimony that the Edison school was just another Barmasters franchise or that it was a separate school that simply used the Barmasters name was contradicted by Connor and generally not credible.

28. Connor tacitly assigned her rights to own a franchise under the Shareholders' Agreement to With a Twist.

29. From the time the Edison school opened until this day, it has been known as the Barmasters Bartending School of Northern New Jersey. Until the events giving rise to this litigation, it has advertised its affiliation with Barmasters and PSB.

30. For a year after the Edison school opened, Connor continued to work for PSB and split her time between the schools. In 1994, she ceased working for PSB and devoted her energies full time to her own franchises.

31. As a franchise of Barmasters, With a Twist and the Edison school used the same promotional materials, letterhead and office

forms, and when it first started up, utilized PSB's resources, such as its credit card merchant accounts, license approvals and certifications by the New Jersey State Department of Education.

32. The Edison school has never paid, nor been asked to pay, any fees due under the Franchise Agreement.

### 3. The Paramus School

33. After the Edison school opened, Connor and Klein formed Without a Twist. This company was used to open the second school Connor was entitled to open under the Shareholders' Agreement, in Paramus, NJ ("the Paramus school").

34. The Paramus school has also advertised, promoted, operated and generally held itself out as a Barmasters franchise.

35. The Paramus school experienced the same start-up support from PSB and Barmasters that the Edison school received, and has also never paid nor been asked to pay fees due under the Franchise Agreement.

### 4. The 800 Number

36. Cahill purchased a toll-free "800" number for the use of all Barmasters franchises ("800 Number"). This number was 1–800–836–3227, which can be represented as 1–800–TEND–BAR.

37. Use of the 800 Number was a strongly promoted selling point for purchasing a Barmasters franchise.

38. PSB reimbursed Cahill for ⅓ of the cost of the 800 Number and With a Twist reimbursed him for the balance.

39. Until such time as other Barmasters franchises began to use the 800 Number, the arrangement was that all telephone calls originating out of Central and Northern New Jersey would be routed to the Edison school and all calls originating out of Southern New Jersey and the Philadelphia area would be routed to PSB. Both PSB and the Edison school shared the maintenance cost of the 800 Number and each paid for the calls it received. The telephone account is located at the Edison school location.

### Events Giving Rise to this Action

### 1. Authentic

40. In June, 1995, Klein contracted with the Company Corporation to organize and incorporate Authentic.

41. The Pennsylvania Department of State's Corporation Bureau's records indicate that Connor is the CEO and Treasurer of Authentic and Klein is the Vice President and Secretary of Authentic.

42. In contrast, Authentic's records reflect that Klein is its President, Treasurer and Secretary.

43. Connor has taken steps to amend the Corporation Bureau's records to reflect that she is not a director or officer of Authentic.

44. Klein currently owns ninety shares of Authentic stock. The other shares are owned by two other individuals. Connor does not own any Authentic stock.

45. Klein is the day to day director of Authentic, and signs contracts and other documents in his name as President.

46. Connor was significantly involved with Authentic in its start-up stage.

47. Connor applied to the City of Philadelphia's Department of Licenses and Inspections for a use registration permit for 11600 Roosevelt Boulevard's use as a bartending school. She appealed the denial of her application to the Philadelphia Zoning Board of Adjustment, attended the Zoning Board hearing and permitted Authentic's lawyer to represent her to the Zoning Board as the applicant and as a principal of Authentic.

48. In March, 1996, Connor signed a rent check on behalf of Authentic, despite her testimony that she does not have check-signing authority from Authentic.

49. 11600 Roosevelt Boulevard, where Authentic's Philadelphia school is located, is approximately half a mile from 10050 Roosevelt Boulevard, where PSB and Barmasters are located.

50. Authentic opened its Philadelphia school in February, 1996 and continues to operate a bartending school at that location.

51. Authentic is not a franchise of Barmasters and is not otherwise authorized to use its trademarks, trade names or methods of instruction and operation.

52. Also in 1995, Connor and Klein formed a New York corporation known as Cocktails, Inc. to run a Manhattan-based bartending school. They are Cocktails's only shareholders.

53. Barmasters has recently sold a Barmasters franchise in New York, which has opened its school in Manhattan.

### 2. The 800 Number

54. In January, 1996, Connor and With a Twist caused and directed the 800 Number's service provider to cease routing calls to PSB, but instead, to route them to Authentic's Philadelphia school or to With a Twist. This direction was made unilaterally and without the consent or knowledge of either PSB or Barmasters.

55. From that time until this action was filed, Authentic and Cocktails advertised themselves in newspapers, telephone books, brochures and other media, using the 800 Number.

56. Authentic's and Cocktails's use of the 800 Number creates a substantial risk of confusing and misleading prospective Barmasters students.

### 3. Misleading Advertisements

57. From the time they began business until the time this action was filed, Authentic and Cocktails used identical copies of Barmasters's advertising and promotional materials, simply changing the name of the school, but leaving all other representations the same.

58. During the same time frame, Authentic placed a series of advertisements in a number of newspapers and telephone books, all of which made the same false representations and statements.

59. Cocktails placed a number of newspaper advertisements making the same false representations and statements.

60. This use resulted in a number of inaccurate statements, such as the claim that Authentic was the "oldest state licensed [bartending] school" in Pennsylvania when it was not, and indeed, was not even state licensed.

61. At all times relevant to this action, PSB has been licensed by the Commonwealth of Pennsylvania's Department of Education as a trade school.

62. At no time has Authentic been licensed as a private school by any state. In late 1995 or early 1996, Authentic, by Klein, applied for a license with the Pennsylvania State Board of Private Licensed Schools. This application was lost and Authentic has since made a new application.

63. Authentic's original license application included a number of untruths, such as that it was approved by the New Jersey Department of Education. These facts are true with respect to Barmasters and PSB, but not with respect to Authentic.

64. Klein testified that the advertisements and promotional materials published by or at the request of Authentic and Cocktails were false and improper.

### 4. Representations to Prospective Students

65. A private investigator testified that he was hired by Barmasters to visit Authentic's Philadelphia school to learn what representations were made to prospective students.

66. He testified that an Authentic representative told him, among other things, that Authentic was licensed by the Commonwealth of Pennsylvania, that it operates other locations throughout the country and that it has an established job placement program.

67. The evidence demonstrated that each of those, and other assertions, are false.

68. When the private investigator gave the Authentic representative his credit card to pay for a bartending course, the Authentic representative processed the charge by use of the credit card machine and account of the Paramus school.

### DISCUSSION

A preliminary injunction can be granted if the movant proffers sufficient evi-

dence that (1) it has a reasonable probability of success on the merits, (2) it will be irreparably harmed by denial of relief, (3) a preliminary injunction will not result in even greater harm to the other party and (4) a preliminary injunction is in the public interest. *Campbell Soup, Inc. v. ConAgra, Inc.,* 977 F.2d 86, 90–91 (3d Cir.1992); *ECRI v. McGraw–Hill, Inc.,* 809 F.2d 223, 226 (3d Cir.1987).

### 1. *Reasonable Probability of Success on the Merits*

#### A. *Lanham Act*

■ Section 1125(a) of the Lanham Act prohibits false designations of origin and false descriptions by stating:

> Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce ... shall be liable to a civil action ... by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

15 U.S.C. § 1125(a). This section is traditionally construed broadly, so as to protect the remedial nature of the Act. *AT & T v. Winback & Conserve Prog., Inc.,* 42 F.3d 1421, 1427 (3d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1838, 131 L.Ed.2d 757 (1995). The Lanham Act protects unregistered marks as well as registered ones so long as the unregistered mark is recognized by the public as identifying the plaintiff's goods or services and not some other party's goods or services. *A.J. Canfield Co. v. Honickman,* 808 F.2d 291, 296 (3d Cir.1986). To prove a claim of unfair competition, a plaintiff must show:

1) defendant has made false or misleading statements about its own or another's products;

2) that there is actual or possible deception of a substantial portion of the intended audience

3) the deception is material in that it is likely to influence purchasing decisions;

4) that the advertised goods traveled in interstate commerce and

5) there is a likelihood of injury to the plaintiff.

*Johnson & Johnson–Merck Consumer Pharms. Co. v. Rhone–Poulenc Rorer Pharms., Inc.,* 19 F.3d 125, 129 (3d Cir.1994). If the challenged statement of representation is demonstrably false, then the plaintiff need not show that consumers were actually misled. *Id.; Sandoz Pharms. Corp. v. Richardson–Vicks, Inc.,* 735 F.Supp. 597, 600 (D.Del. 1989), *aff'd,* 902 F.2d 222 (3d Cir.1990).

■ Applying those factors to this action, it has been shown that Defendants made a number of literally false statements in their advertisements and promotions. These misstatements were material, especially with respect to the license status of Authentic, its established employment service, its proven success and its presence around the country. Plaintiffs, therefore, have proved the first four prongs. In addition, Plaintiffs presented evidence on the fifth prong, that they have suffered injury in the sense that Authentic is diluting the Barmasters name. Further, a prospective student in Southern New Jersey or in Pennsylvania who calls the 800 Number, expecting to contact PSB, now gets the Edison school, which no longer refers business to PSB. Before Authentic stopped using the 800 Number, Authentic would receive calls intended for PSB.

For these reasons, we find that Plaintiffs have shown a reasonable probability of success on the merits of their Lanham Act claim.

#### B. *Breach of Franchise Agreement*

Plaintiffs seek to hold Defendants liable for breach of the Restrictive Covenant found in the Franchise Agreement. They seek this despite the acknowledged fact that no Defendant ever actually executed a Franchise Agreement. Plaintiffs contend first, that Connor's Shareholders' Agreement is ambiguous and that this Court should refer to the Franchise Agreement to help understand the intention of the parties because the Share-

holders' Agreement necessarily refers to the Franchise Agreement. *International Org. Master Mates & Pilots of America, Local No. 2 v. International Org. Masters, Mates & Pilots of America, Inc.*, 497 Pa. 102, 109–111, 439 A.2d 621, 624–25 (1981); *M. Barry Schultz & Co. v. APM Horsham, Inc.*, 835 F.Supp. 820, 823 (E.D.Pa.1993); *West Dev. Grp., Ltd. v. Horizon Fin., F.A.*, 405 Pa.Super. 190, 197, 592 A.2d 72, 75 (1991). Plaintiffs also assert that even if a contract is not ambiguous, that a court can imply an obligation that is within the contemplation of the parties at the time of contracting. *Slater v. Pearle Vision Ctr., Inc.*, 376 Pa.Super. 580, 587, 546 A.2d 676, 679 (1988).

Here, Plaintiffs contend that the Franchise Agreement is incorporated into the Shareholders' Agreement. Then, when Connor tacitly assigned her rights under the Shareholders' Agreement to With a Twist, it and its shareholders also became bound by the Franchise Agreement. Given this, Plaintiffs assert that Defendants should be held to the terms of the Non–Compete Covenant found in the Franchise Agreement.[1]

Defendants make no specific objection to this argument, but rather, simply assert that there is no evidence that Connor ever signed a Franchise Agreement.

■ We find that the Shareholders' Agreement is not ambiguous. In Pennsylvania, however, even when a contract is not ambiguous, a court may utilize the doctrine of necessary implication to "enforce the clear intentions of the parties and avoid injustice" when "an obligation is within the contemplation of the parties at the time of contracting." *Slater*, 376 Pa.Super. at 586, 546 A.2d at 679; *West Dev.*, 405 Pa.Super. at 197, 592 A.2d at 75 ("when a contract refers to a separate document, a court may examine the language of the other document to ascertain the intent of the parties"). Here, we find that the Shareholders' Agreement necessarily implies the terms of the Franchise Agreement. The Shareholders' Agreement's section 4 is captioned "Franchises" and lays out the terms

by which Connor can open and operate three Barmasters franchises. This section refers to an "initial fee required of all franchises," and the "standard ongoing Barmasters franchise fee." Both of these fees are defined in the Franchise Agreement. Further, we agree that when Connor assigned her rights under the Shareholders' Agreement to With a Twist, it and its shareholders assumed the Franchise Agreement's duties as well.

■ Because we find that Defendants are bound by the Franchise Agreement, we turn to whether Plaintiffs have demonstrated a reasonable likelihood of success on their claims of breach of that contract. The Franchise Agreement's Covenant Not To Compete prohibits franchisees from "directly or indirectly engag[ing] in a business providing to the consuming public any courses or programs similar to those offered by Barmasters or its Franchisees." The evidence clearly supports a finding that Defendants have undertaken just such an endeavor. Plaintiffs, therefore, have demonstrated a reasonable likelihood of success on the merits of a breach of the Franchise Agreement claim.

*C. Intentional Interference with Prospective Contractual Relations*

■ To prevail on an intentional interference with prospective contractual relations claim, a plaintiff must prove (1) a prospective contractual relation, (2) that defendant's purpose or intent is to harm plaintiff by preventing the relation from occurring, (3) that defendant lacks a privilege or justification and (4) actual damages to plaintiff as a result of defendant's conduct. *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 208, 412 A.2d 466, 471 (1979); *Vintage Homes, Inc. v. Levin*, 382 Pa.Super. 146, 155, 554 A.2d 989, 994, *app. denied*, 524 Pa. 622, 571 A.2d 384 (1989).

■ A prospective contractual relationship is a reasonable probability of a contract, *i.e.*, "something less than a contractual right, [but] something more than a mere hope." *Thompson Coal*, 488 Pa. at 209, 412

---

1. The parties apparently agree that the non-compete covenant is legally enforceable in general because it: (1) relates to a proprietary business interest, (2) is supported by sufficient consider-

ation and (3) is reasonably limited in time and geography. *Piercing Pagoda, Inc. v. Hoffner*, 465 Pa. 500, 511, 351 A.2d 207, 212 (1976).

A.2d at 471. A defendant need not act with the specific intent of interfering with plaintiff's contracts. Rather, the second prong is satisfied if defendant acts improperly and with the knowledge that such interference is substantially certain to occur. Restatement (Second) of Torts § 766 cmt. j; § 766B cmt. d (1979). Whether a defendant is privileged or justified in a particular course of conduct is defined by "the rules of the game," or the "area of socially acceptable conduct which the law regards as privileged." *Glenn v. Point Park College*, 441 Pa. 474, 482, 272 A.2d 895, 899 (1971).

First, Plaintiffs contend that they had a reasonable probability of entering into a contractual relationship with any one of the people who called the 800 Number after it was diverted to Authentic's offices or who contacted Authentic directly based on Barmasters's usurped advertising. Second, Plaintiffs charge that Defendants were aware that such a diversion of students would occur as a result of their use of Barmasters's advertising and telephone number. Third, Plaintiffs declare that there is no possible privilege or justification for Defendants' actions. Finally, Plaintiffs do not present actual evidence of damage to them from Defendants' actions. Rather, they ask the Court to presume damages from the very nature of the conduct.

Defendants' response is to argue that Plaintiffs can only prevail on this cause of action if they show that they were prevented from entering into contracts as a result of Defendants' actions. They make no legal citation that would support this standard and in fact, this is not the law. For example, in *Vintage Homes,* the Superior Court found the tort well-pleaded when the defendant wrongfully filed a lis pendens on a property. The Court noted that, "while [a] lis pendens does not create an actual lien, ... [it] could very well have discouraged a prospective buyer from completing a deal to purchase the property." 382 Pa.Super. at 155, 554 A.2d at 994.

This Court finds that Plaintiffs have submitted evidence tending to prove each of the first three points of the test. As to the damage point, it is probable that further

discovery will demonstrate some harm as a result of Defendants' actions. Accordingly, we find that Plaintiffs have demonstrated a reasonable likelihood of success on the merits of this claim.

### D. Civil Conspiracy

A civil conspiracy is the combination of two or more to do an unlawful act or to do an otherwise lawful act by unlawful means when some overt act is taken in furtherance of the conspiracy and some actual legal harm accrues to the plaintiff. *Thompson,* 488 Pa. at 211, 412 A.2d at 472; *Landau v. Western Pa. Nat'l Bank,* 445 Pa. 217, 224, 282 A.2d 335, 339 (1971). Malice, *i.e.,* intent to injure and a lack of justification, are essential parts of a civil conspiracy cause of action. *Rutherfoord v. Presbyterian–Univ. Hosp.,* 417 Pa.Super. 316, 333, 612 A.2d 500, 508–09 (1992).

Plaintiffs argue that they have shown that Connor, Klein and their companies combined to make Authentic violate the Lanham Act and to interfere with Plaintiffs' prospective contractual relations and that therefore, they have shown civil conspiracy. Defendants object and contend that there has been no showing of an unlawful act or malice by any Defendant.

We agree with Defendants that Plaintiffs have failed to present evidence going to malice or intent to injure. We do not find that Plaintiffs never could make such a showing, only that they have failed to do so at this preliminary stage. For this reason, we find that Plaintiffs have failed to show a reasonable likelihood of success on the merits of their civil conspiracy claim.

### 2. Irreparable Harm to the Parties

Plaintiffs assert that they have shown irreparable injury. First, under the Lanham Act, irreparable injury is presumed once a violation is shown. *McNeilab, Inc. v. American Home Prods. Corp.,* 848 F.2d 34, 38 (2d Cir.1988); *Nester's Map & Guide Corp. v. Hagstrom Map Co.,* 760 F.Supp. 36 (E.D.N.Y.1991). With respect to their common law causes of action, Plaintiffs maintain that irreparable injury has been shown by

virtue of the ongoing breaches of the Franchise Agreement by Defendants. *ECRI v. McGraw–Hill, Inc.,* 809 F.2d at 226.

Defendants contest this argument and assert that no evidence of any injury, much less irreparable injury, was shown. In fact, Defendants argue that their actions have benefited Barmasters because the first Barmasters franchise ever sold to an unrelated person occurred after Authentic began to operate. Second, Defendants point out that there was no evidence of a drop in enrollment or the like that would show injury to PSB. Finally, Defendants profess that they have ceased Authentic's use of the 800 Number and Barmasters's advertising materials, and so no damage currently results from that.

 The purpose of a preliminary injunction is to provide relief when it is the only way to protect the plaintiff from harm, that is, when money damages are inadequate to protect the plaintiff. *Campbell Soup,* 977 F.2d at 91. We find that here, Plaintiffs have shown irreparable harm. First, precedents indicate that irreparable harm can be presumed once a Lanham Act violation is shown. Second, Defendants now have control of the 800 Number. There is no indication what kind of marketing efforts Defendants are making. It could be that Defendants are making many more successful phone "pitches" to callers than PSB ever did, or, it could be that PSB was much more successful. For this reason, if we were to deny a preliminary injunction and limit Plaintiffs to recovering the tuitions they lost by virtue of calls being routed away from them, their recovery might not accurately reflect what their earnings would have been had they received the 800 Number calls.

Likewise, the print advertising still exists in current telephone books and archived newspapers. A prospective student might call Authentic in reliance of the averments of licensing, stability and the like and be discouraged by Authentic's start-up reality. That future student might then be discouraged from contacting PSB, which's advertising makes the same, but in its case, true, averments of licensing, stability and the like. The false information in the marketplace,

therefore, also shows irreparable harm to Plaintiffs.

Plaintiffs must also show the converse, that granting this preliminary injunction will not create an ever greater harm to Defendants. They argue that they simply seek to hold Defendants to the law and to the contracts into which Defendants voluntarily entered. This, Plaintiffs insist, cannot be considered a harm. In contrast, Defendants assert that because they have done nothing wrong and because they are not bound by any contracts, that requiring them to cease their businesses would inflict a very great harm.

We find that a grant of a preliminary injunction, in general, would not harm Defendants more than not granting one would harm Plaintiffs.

### 3. Public Interest Factors

 Finally, Plaintiffs assert that their interest in protecting their trade names, customer relations and good will, as well as their interest in the non-compete clause, outweigh the public's interest in free competition. *Novus Franchising, Inc. v. Taylor,* 795 F.Supp. 122, 132 (M.D.Pa.1992) ("long-established line of authority" that the public's interest is outweighed by breach of non-compete covenant). Defendants, understandably, contest this and argue that if Authentic is ordered to cease operations, the public will suffer.

We find that Plaintiffs' interests do outweigh the public's interest in free competition. Further, we find that the public's interest will be furthered by granting a preliminary injunction that cures false advertising and representations.

### 4. Conclusion

As is evident from the above discussion, this Court finds that a preliminary injunction is appropriately granted. The only question remaining is what will be included in that injunction. Plaintiffs seek an order:

A) enjoining and restraining defendants, their respective officers, directors, agents, employees and attorneys, from doing, and

from aiding, abetting or causing any other person or entity to do any of the following:

1) directly or indirectly engaging in the business of providing bartending courses at any location other than the existing Barmasters Bartending School locations operated by With a Twist and/or Connor and Klein in Edison, NJ and Paramus, NJ for so long as Connor and With a Twist remain franchisees of Barmasters;

2) directly or indirectly engaging in the business of providing bartending courses at any location within ten miles of any bartending school presently operated by PSB, or within ten miles of the existing Barmasters schools operated by With a Twist and/or Connor and Klein in Edison, NJ and Paramus, NJ for a period of 18 months following the termination of the Franchise Agreement;

3) directly or indirectly causing or permitting telephone callers to the 800 Number to be directed or referred to Authentic;

4) directly or indirectly using, maintaining or continuing to use any telephone number which Authentic has advertised or listed in connection with the false representation that its school is state licensed, including, but not limited to, the telephone number 215–676–9900;

5) directly or indirectly referring callers to any telephone numbers presently maintained or used, or hereafter obtained or used by Barmasters Bartending School of Northern New Jersey, to Authentic;

6) directly or indirectly advertising, representing, stating or implying that any bartending school operated by Authentic is licensed by the Commonwealth of Pennsylvania unless and until Authentic is in fact so licensed;

7) directly or indirectly advertising, representing, stating or implying that Authentic is the "oldest" licensed bartending school or that Authentic has operated any bartending school prior to January, 1996;

8) directly or indirectly advertising, representing, stating or implying that Authentic operates bartending schools at more than one location unless and until Authentic in fact does so, and

9) directly or indirectly advertising, representing, stating or implying that Authentic is in any way affiliated with, approved or endorsed by, or a franchise of, Barmasters;

B) compelling Defendants to immediately cause and permit the entity providing the 800 Number service to direct and forward all calls to the 800 Number originating in Pennsylvania or Southern New Jersey to PSB for so long as PSB continues to pay its share of the cost of such service;

C) compelling Defendants Authentic, Connor and Klein to account for and pay over to Plaintiffs McIlvaine and McGowan, individually and t/a PSB, all gains, profits and advantages received by them from Authentic's operation in Philadelphia;

D) awarding Plaintiffs punitive damages in connection with Counts I, II, III and VI of the claims asserted in their Complaint;

E) ordering Defendants to pay Plaintiffs their attorneys's fees and all costs associated with this action.

We note that Defendants take no issue with the majority of the relief requested by Plaintiffs. For that reason, requests A(3 & 6–9) will be granted. We also grant requests A(4 & 5) and B because they will help cure the irreparable harm suffered by Plaintiffs. With respect to A(4), we note that when the number 215–676–9900 is disconnected, no forwarding information should be provided by the telephone company; otherwise, Authentic will still gain the benefit of the false advertising using that number.

A(1 & 2) will be granted because these requests simply enforce the Franchise Agreement. Request C is denied because Plaintiffs have failed to prove actual loss as a result of Authentic's actions. Requests D and E are more appropriate for the permanent injunction and are not addressed here.

An appropriate Order follows.

### ORDER

AND NOW, this 12th day of June, 1996, upon consideration of Plaintiffs' Motion for Preliminary Injunction, Defendants' Response thereto, a hearing on the matter and the parties' proposed findings of fact and

conclusions of law, the Motion is hereby GRANTED.

Defendants, their respective officers, directors, agents, employees and attorneys are hereby preliminarily:

A) enjoined and restrained from doing, and from aiding, abetting or causing any other person or entity to do any of the following:

1) directly or indirectly engaging in the business of providing bartending courses at any location other than the existing Barmasters Bartending School locations operated by With a Twist and/or Connor and Klein in Edison, NJ and Paramus, NJ for so long as Connor and With a Twist remain franchisees of Barmasters;

2) directly or indirectly engaging in the business of providing bartending courses at any location within ten miles of any bartending school presently operated by PSB, or within ten miles of the existing Barmasters schools operated by With a Twist and/or Connor and Klein in Edison, NJ and Paramus, NJ for a period of 18 months following the termination of the Franchise Agreement;

3) directly or indirectly causing or permitting telephone callers to the 800 Number to be directed or referred to Authentic;

4) directly or indirectly using, maintaining or continuing to use any telephone number which Authentic has advertised or listed in connection with the false representation that its school is state licensed, including, but not limited to, the telephone number 215–676–9900;

5) directly or indirectly referring callers to any telephone numbers presently maintained or used, or hereafter obtained or used by Barmasters Bartending School of Northern New Jersey, to Authentic;

6) directly or indirectly advertising, representing, stating or implying that any bartending school operated by Authentic is licensed by the Commonwealth of Pennsylvania unless and until Authentic is in fact so licensed;

7) directly or indirectly advertising, representing, stating or implying that Authentic is the "oldest" licensed bartending school or that Authentic has operated any bartending school prior to January, 1996;

8) directly or indirectly advertising, representing, stating or implying that Authentic operates bartending schools at more than one location unless and until Authentic in fact does so, and

9) directly or indirectly advertising, representing, stating or implying that Authentic is in any way affiliated with, approved or endorsed by, or a franchise of, Barmasters;

B) compelling Defendants to immediately cause and permit the entity providing the 800 Number service to direct and forward all calls to the 800 Number originating in Pennsylvania or Southern New Jersey to PSB for so long as PSB continues to pay its share of the cost of such service.