PHARMACIA CORPORATION,
et al., Plaintiffs,

v.

GLAXOSMITHKLINE CONSUMER
HEALTHCARE, L.P., et al.,
Defendants.

Civil Action No. 02–5292(MLC).

United States District Court,
D. New Jersey.

Nov. 24, 2003.

---

See Also, 292 F.Supp.2d 594, 2003 WL 22964044.

John C. McGuire, Sedgewick, Detert, Moran & Arnold, LLP, Newark, NJ and John B. Williams, Judith L. Oldham, Thomas W. Mitchell, and Kerrie L. Hook, Collier Shannon Scott PLLC, Washington, DC, for Plaintiff.

William F. Maderer, Saiber Schlesinger Satz & Goldstein LLC, Newark, NJ, and Helene D. Jaffe, Bruce S. Meyer, and Randi W. Singer, Weil, Gotshal & Manges LLP, New York, N.Y., for Defendant.

## MEMORANDUM OPINION

COOPER, District Judge.

This matter comes before the Court on the motion by GlaxoSmithKline Consumer

Healthcare, L.P. ("GSKCH") pursuant to Federal Rule of Civil Procedure ("Rule") 65(a) for a preliminary injunction enjoining Pharmacia Corporation ("Pharmacia") from broadcasting a television commercial entitled "Trying to Quit." GSKCH contends that certain of the claims made by Pharmacia in "Trying to Quit" violate Section 43(a) of the Lanham Act, codified at 15 U.S.C. § 1125(a) ("the Lanham Act"). The Court will grant GSKCH's motion.

## BACKGROUND

This case involves a dispute between distributors of over-the-counter ("OTC") products designed to help purchasers stop smoking cigarettes. Pharmacia and GSKCH market competing brands of nicotine replacement therapy ("NRT") products in the United States. (GSKCH Supp. Br. at 1.) Pharmacia sells a nicotine transdermal patch under the brand name Nicotrol ("Nicotrol"). (*Id.*) Nicotrol's directions state it is to be worn for 16 hours at a time. (4–16–03 Jaffe Dec., Ex. 1.) GSKCH markets a competing nicotine transdermal patch under the brand name NicoDerm CQ ("NicoDerm"). (GSKCH Supp. Br. at 1.) NicoDerm's instructions state that it may be worn for 16 or 24 hours. (2d Horvath Dec., Ex. 10.)

Pharmacia began airing "Trying to Quit" in February, 2003. (GSKCH Supp. Br. at 1.) The 15–second commercial shows a man tossing and turning in bed. (Videotape of "Trying to Quit"("ToQ").) A patch is barely visible on the man's right arm. (*Id.*) The man suddenly sits bolt upright. (*Id.*) An announcer then states: "Trying to beat cigarettes? Having trouble sleeping?

You're probably using NicoDerm. Just read their label." (*Id.*) An image of NicoDerm's label appears, and the camera zooms in to focus on the part of the label reading: "If you have vivid dreams or other sleep disturbances, remove this patch at bedtime." (*Id.*) The words "sleep disturbances" are underlined in red. (*Id.*) The ad then shows the Nicotrol box, as the voice-over states: "The new step-down patch from Nicotrol was designed to let you sleep." (*Id.*) Superimposed text on the screen reads: "Nicotrol studies show low incidence of sleep disturbance vs. placebo." (*Id.*) The image then shifts to a shot of the same man sleeping peacefully, while the announcer says: "And with new Nicotrol, you're twice as likely to quit than with cold turkey." [1] (*Id.*)

GSKCH alleges that two aspects of "Trying to Quit" make false claims in violation of the Lanham Act. First, GSKCH asserts that the statement "Nicotrol was designed to let you sleep" necessarily implies the false claim that Nicotrol has an advantage over NicoDerm in preventing sleep disturbances. Second, GSKCH contends that the statement "You're probably using NicoDerm" explicitly makes the false claim that any person who is (a) trying to quit smoking and (b) experiencing sleep disturbances is more likely than not using NicoDerm. The Court held an evidentiary hearing on July 11, 2003 and August 26, 2003 to determine whether a preliminary injunction should issue.[2]

## DISCUSSION

"[A]n injunction is an extraordinary remedy, which should be granted

---

**1.** The term "cold turkey" denotes those smokers attempting to quit by themselves, that is, without using NRTs or other available therapies. (GSKCH Rep. Br. at 18–19.)

**2.** An issue arose during the August 26, 2003 proceeding as to whether certain declarations that had not been offered into evidence at the

July 11, 2003 hearing should nevertheless be considered part of the record for the purposes of this motion. We do not decide that issue, as we have concluded after reviewing the declarations in question that their inclusion into evidence would make no difference in the outcome of this matter.

only in limited circumstances." *Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir.2002) (quotations omitted). The Court will only issue a preliminary injunction if we are

> convinced that the following factors favor granting preliminary relief: (1) the likelihood that the moving party will succeed on the merits; (2) the extent to which the moving party will suffer irreparable harm without injunctive relief; (3) the extent to which the nonmoving party will suffer irreparable harm if the injunction is issued; and (4) the public interest.

*Id.; see also AT & T v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir.1994) ("The injunction should issue only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief.").

## I. *Likelihood of Success on the Merits*

### a. *The Lanham Act*

■ GSKCH must first show that at trial it is likely to succeed in proving that "Trying to Quit" violates the Lanham Act. The Lanham Act reads, in pertinent part,

> (1) Any person who ... in connection with any goods or services ... uses in commerce any word, term, name, symbol, or device, or any combination thereof, or ... false or misleading description of fact, or false or misleading representation of fact, which—
>> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geograph-

ic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. 15 U.S.C. § 1125(a). To prove a Lanham Act violation, the complainant must show:

> (1) the [alleged violator] made false or misleading statements about the [complainant's or his own] product; (2) there is actual deception or a tendency to deceive a substantial portion of the intended audience; (3) the deception is material in that it is likely to influence purchasing decisions; (4) the advertised goods traveled in interstate commerce; and (5) there is a likelihood of injury to the [complainant].

*Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 171 (3d Cir.2001). Here, neither party contests the existence of the latter three elements: materiality, travel in interstate commerce, or likelihood of injury. Accordingly, we will focus our inquiry on the first two showings only: the false or misleading claim that deceives or has a tendency to deceive consumers.

■ The false or misleading claim may be proved in one of two ways. The movant must show that "the commercial message or statement is either (1) literally false or (2) literally true or ambiguous, but has the tendency to deceive consumers." *Novartis*, 290 F.3d at 586. If the complainant can show literal falsity, "the court may grant relief without reference to the advertisement's impact on the buying public." *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 943 (3d Cir.1993).

In analyzing whether an advertisement or product name is literally false, a court must determine, first, the unambiguous claims made by the advertisement ..., and second, whether those claims are false. A literally false message may be

either explicit or conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated. *Novartis,* 290 F.3d at 586–87 (quotations and citations omitted). However, "only an *unambiguous* message can be literally false"; if the message is susceptible of more than one meaning, the complainant cannot assert literal falsity. *See id.* at 587.

■ Where the movant is unable to demonstrate that the complained-of statement is literally false, a Lanham Act violation may still be established by proving that the commercial makes a false or misleading claim *and* that a substantial portion of consumers actually understand the ad to be making that claim. *See Johnson & Johnson–Merck Consumer Pharms. Co. v. Rhone–Poulenc Rorer Pharms., Inc.,* 19 F.3d 125, 129 (3d Cir.1994) (*"Rorer"*); *Dentsply Int'l, Inc. v. Great White, Inc.,* 132 F.Supp.2d 310, 324 (M.D.Pa.2000). When the complainant chooses this evidentiary route because literal falsity cannot be shown, the complainant "must prove that [the statement] is deceptive or misleading, which depends on the message that is conveyed to consumers." *Rorer,* 19 F.3d at 129. Evidence that consumers are actually misled by the alleged violator's statements must therefore be produced; speculation as to how consumers could react is insufficient. *See Highmark,* 276 F.3d at 171.

#### b. *"Nicotrol Was Designed to Help You Sleep"*

■ GSKCH alleges that "Trying to Quit" makes the literally false claim that

Nicotrol has an advantage over NicoDerm with regard to sleep disturbances. GSKCH asserts that Nicotrol's claim that "Nicotrol was designed to help you sleep," when viewed in the context of the entire commercial, either expressly claims or necessarily implies that Nicotrol is somehow superior to NicoDerm at allowing people to sleep better while trying to quit smoking. GSKCH further contends that this claim is false because there are no demonstrable differences between Nicotrol and NicoDerm with regard to sleep disturbances when both are used for 16 hours.[3]

■ The Court must determine "first, the unambiguous claims made by the advertisement . . . , and second, whether those claims are false." *Novartis,* 290 F.3d at 586. An unambiguous claim can be explicit, or can be necessarily implied by the advertisement. *Id.* at 586–87. If the statement in question does not make an unambiguous claim, there is no Lanham Act violation absent a showing of actual consumer deception. *See id.* at 587. The Court must look at the commercial as a whole when making its assessment. *See, e.g., Rorer,* 19 F.3d at 129 ("A determination of literal falsity rests on an analysis of the message in context.").

Pharmacia raises three arguments in response to GSKCH's interpretation of "Trying to Quit." First, Pharmacia contends the commercial does not claim Nicotrol has any design advantage over NicoDerm. We disagree. The commercial directly compares the two products, disparages NicoDerm because of its association with sleep disturbances, and then trumpets Nicotrol as being "designed" to avoid these

---

**3.** GSKCH makes two alternative claims as well. First, GSKCH asserts that "Trying to Quit" makes the false claim that NicoDerm is *not* designed to let you sleep. Second, GSKCH contends the ad is false because it omits material information, namely, that NicoDerm, like Nicotrol, is approved for 16—as well as 24–hour use. Since we conclude, *infra,* that GSKCH's assertion that "Trying to Quit" falsely claims an advantage for Nicotrol in the context of sleep disturbances is correct, we need not address these alternative contentions.

same disturbances. We find that the ad makes a claim of some kind of superiority.

Pharmacia also urges us to view the statement in question not as part of the overall theme of comparing Nicotrol and NicoDerm, but merely as a reflection of the history of Nicotrol. Pharmacia introduced testimony explaining that from its inception as a product, the inventors of Nicotrol *intended to design* the patch to prevent sleep disturbances. (7–11–03 H'g Tr. at 159–77.) That is, Pharmacia urges that the statement "Nicotrol was designed to let you sleep" in the overall context of the commercial should not be understood to mean "Nicotrol will let you sleep better than NicoDerm" but rather "Nicotrol was designed with the intent to let you sleep, but from this statement you should take no guarantee that it actually does let you sleep any better than NicoDerm." We find there is no basis for this interpretation of the commercial. The ad lines up two products and compares them, with a special focus on their impact on a user's sleep. There is no mention of what Nicotrol's designers intended in the mid–1980s, when the product was developed. In the words of GSKCH's attorneys: "This interpretation is absurd. The 'Trying to Quit' advertisement is a comparison of supposed product features, not a documentary about the making of the Nicotrol Patch." (GSKCH Rep. Br. at 14.)

Pharmacia contends finally that to the extent the commercial makes any claim, such claim is ambiguous, and therefore GSKCH can only show a Lanham Act violation by proving that consumers actually received the alleged claim of superiority. This objection we must reject as well. It is true that "Trying to Quit" does not expressly state "Nicotrol is better than NicoDerm when it comes to sleep disturbances." However, "when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated," a complainant may prove literal falsity. *Novartis*, 290 F.3d at 586–87 (quotations omitted). The commercial shows a man tossing and turning in his sleep. In succession, the ad asks if you are trying to quit smoking and if you cannot sleep, and then associates Nico-Derm with sleep disturbance. It then tells the viewer that Nicotrol was designed to help you sleep. The next shot is of the man sleeping peacefully. Within this context, there is only one message consumers can take away from the statement "Nicotrol was designed to let you sleep": the unambiguous, necessarily implied claim that Nicotrol helps you sleep better than NicoDerm.

 The next inquiry is whether this unambiguous claim is false. Normally, the movant has the burden to demonstrate that the alleged violator's advertising claim is false. *Novartis*, 290 F.3d at 590. However, the Third Circuit announced in *Novartis* that "a court may find that a completely unsubstantiated advertising claim by the [non-movant] is *per se* false without additional evidence from the [complainant] to that effect." *Id.* Pharmacia has no basis for its claim that Nicotrol is better than NicoDerm with regard to sleep disturbances, and therefore we hold that claim is per se false.

Pharmacia asserts that its claim of superiority is true because Nicotrol has four distinct design elements that differentiate it from NicoDerm: the length of time the patch is worn (16 hours for Nicotrol versus 16 or 24 hours for NicoDerm); the amount of nicotine contained in the patch (25 milligrams versus 114 milligrams); the amount of nicotine absorbed by the user from the patch over 16 hours of use (6 to 7 milligrams versus 12 milligrams); and the residual amount of nicotine left in the patch after 16 hours of use (10 milligrams versus 102 milligrams). (7–11–03 H'g Tr. at 223–

25.) Pharmacia claims that these differences provide a sufficient basis for an advertisement that Nicotrol has an advantage over NicoDerm with regard to sleep disturbances.

GSKCH rejoins, however, that there is no evidence that the latter three differences listed above (amount of nicotine in the patch, amount absorbed, and residual amount) have any bearing on sleep disturbances. In fact, GSKCH claims, all the evidence is to the contrary. Pharmacia's own two witnesses testified that they knew of no evidence that these three design elements give Nicotrol an advantage with respect to sleep disturbances. (*Id.* at 185–86, 230–32.) Another Pharmacia witness testified in a deposition that the only advantage NicoDerm has with respect to sleep disturbance is that it is worn for 16–hours. (2d Horvath Dec., Ex. 1, at 22.) Thus, GSKCH claims, Pharmacia cannot claim Nicotrol's superiority with regard to sleep disturbances on the basis of these three features.

GSKCH readily admits that the first feature listed above, Nicotrol's 16 hour use, does lead to fewer sleep disturbances, but contends that this feature does not provide a basis for a claim that Nicotrol has an advantage over NicoDerm. First, it is undisputed that NicoDerm has this exact same design feature, and for the exact same reason: NicoDerm too may be worn for 16 hours, rather than 24, in order to reduce sleep disturbances. (GSKCH Supp. Br. at 2; Pharm. Opp. Br. at 10–11; 7–11–03 H'g Tr. at 83.) Second, GSKCH claims that there is no evidence that there is any difference in sleep disturbances between consumers using Nicotrol for 16 hours versus those using NicoDerm for 16 hours. If Pharmacia has no evidence that 16 hours of Nicotrol leads to better sleep than 16 hours of NicoDerm, GSKCH concludes, this claim may not be made in the commercial.

The Court finds that Pharmacia has no basis for its claim that Nicotrol enjoys an advantage over NicoDerm with respect to sleep disturbances. There is no evidence in the record that any of the design features distinguishing Nicotrol from NicoDerm impact sleep disturbances in any way. We find that the only feature of Nicotrol for which there is evidence of an impact on sleep disturbance is that it must be worn for 16 hours. However, this feature is not a basis for differentiation from NicoDerm, because NicoDerm, too, may be worn for 16 hours. The only difference is that NicoDerm *may* be worn for 16 *or* 24 hours, while Nicotrol can only be worn for 16 hours.

██ Nicotrol could still claim a product advantage if it had any evidence that 16 hours of NicoDerm causes more sleep disturbances than does 16 hours of Nicotrol. We find, however, that while Pharmacia has introduced evidence showing that Nicotrol users have low incidences of sleep disturbances (*id.* at 202–03, 206), and that people using NicoDerm for 24 hours experience higher levels of sleep disturbances (*id.* at 207–08), there is no evidence comparing the effect of 16–hour Nicotrol to that of 16–hour NicoDerm on sleep disturbances. (*Id.* at 92, 185–86.) The testimony of Pharmacia's witness, Dr. Urbain Sawe, sums up the deficiency:

MR. MEYER: [D]oes the Nicotrol patch have any design advantage over the NicoDerm patch in terms of sleep disturbances? Sixteen versus 16[sic]?

DR. SAWE: No. . . . [T]here is no information about [the] comparison [between] 16 Nicotrol and 16 NicoDerm. You have to do that in head-to-head to see if this little difference [in the amount of nicotine delivered], you call it, if that has any effect on sleep disturbance.

MR. MEYER: And it has not been such a head-to-head, correct?

DR. SAWE: No.

(*Id.* at 186.) Absent such a showing, the Court must find that Pharmacia's claim is per se false. The Lanham Act forbids completely baseless claims as well as demonstrably false ones. *See Novartis*, 290 F.3d at 590. GSKCH has shown a likelihood of success on the merits for this assertion.

### c. *"You're Probably Using Nico-Derm"*

 GSKCH contends that "Trying to Quit" also conveys the literally false claim that any person who is both trying to quit smoking and experiencing sleep disturbances is more likely than not using Nico-Derm. GSKCH alleges that when Pharmacia shows a person having trouble sleeping, and then asks "Trying to beat cigarettes? Having trouble sleeping? You're probably using NicoDerm," the ad is literally claiming that NicoDerm accounts for more than half of the incidence of sleep disturbances among all people trying to quit smoking. GSKCH further asserts that this claim is false because, once again, there is no basis in fact for Pharmacia's claim.

Our two-fold task is to determine the unambiguous claim, if any, made by the commercial, and then to assess whether that claim is false. *Novartis*, 290 F.3d at 586. Pharmacia argues that "Trying to Quit" does not claim that NicoDerm causes the majority of sleep disturbances among *all* people trying to quit, but only the majority of sleep disturbances among all people who are using patches to try to quit.[4] The basis for Pharmacia's argument is that the sleepless actor in the ad is wearing a patch on his right arm. The presence of the patch, Pharmacia argues, in conjunction with the commercial's over-

all comparison between two transdermal patches, shows that the ad's claim is limited to people trying to quit with the help of transdermal patches.

We disagree. The patch worn by the sleepless actor is visible for only a brief instant in the 15–second commercial. Furthermore, since the actor is trying to sleep, the commercial is dark, further obscuring the patch from view. The patch is also very small. This fleeting image of a near-ly-undetectable patch does not save "Trying to Quit" from the clearly audible words the announcer states: "Trying to beat cigarettes? Having trouble sleeping? You're probably using NicoDerm." The announcer does not say "Trying to beat cigarettes with a patch?" or "Having trouble sleeping with a patch?" Unless the viewer is watching the commercial in slow-motion and has handy a magnifying glass with which to detect the patch on the actor's right arm, there is no indication that the announcer's comments are limited to the patch-wearing segment of the quitting-smoking population. This meaning is even further clarified by the announcer's comment a few seconds later that "with new Nicotrol, you're twice as likely to quit than with cold turkey" (rather than "twice as likely to quit than with other patches").

We find that "Trying to Quit" unambiguously claims that people who experience sleep disturbances while trying to quit smoking are more likely than not using NicoDerm. Unlike with GSKCH's first claim, this assertion is explicit. Given the de minimis significance of the patch on the actor's arm, we find that "Trying to beat cigarettes?" means simply "are you trying to quit smoking?" We find that "Having trouble sleeping?" means "are you having

---

4. Pharmacia further contends that this claim is true—a person experiencing sleep disturbances while trying to quit smoking with a transdermal patch is probably using Nico-

Derm. Since we do not find that this is the claim the commercial makes, we do not address this claim's veracity (or lack thereof).

trouble sleeping while you're trying to quit smoking?" Following these two pointed interrogatories, we conclude that the assertion "You're probably using NicoDerm" means "there is evidence that your sleep disturbances are more likely than not the result of your using NicoDerm to quit smoking."

The next inquiry is whether this claim is false. We reiterate that while the complainant ordinarily has the burden of proving the claim is false, such proof is unnecessary where the alleged violator has absolutely no substantiation for its claim. *See Novartis*, 290 F.3d at 590. Pharmacia has provided no basis for the claim that NicoDerm accounts for the majority of all sleep disturbances suffered by all people trying to quit smoking.[5] The only support Pharmacia has advanced is that GSKCH has not proved that Nico-Derm does *not* cause the majority of sleep disturbances among all people attempting to quit smoking. Proof that one's contention cannot be *dis* proved, however, is an insufficient basis for broadcasting a claim on a commercial. Before a Lanham Act complainant has a burden to prove a claim is false, the alleged violator must be able to point to *some* evidence supporting the veracity of the claim.[6] Accordingly, we find that Pharmacia's claim that people who experience sleep disturbances while trying to quit smoking are more likely than not using NicoDerm is false. GSKCH has demonstrated a likelihood of success on the merits.

## II. *Irreparable Harm*

■■■ The Court, having found that GSKCH has shown a likelihood of success on its claim that "Trying to Quit" violates the Lanham Act, proceeds to the irreparable harm inquiry. The moving party, GSKCH, must demonstrate that it will suffer irreparable harm if the injunction does not issue. Further, GSKCH must show that the harm Pharmacia will suffer if the Court enjoins it from airing "Trying to Quit" is outweighed by the harm to GSKCH in the absence of an injunction.

### a. *Harm to GSKCH*

■■■ GSKCH can show irreparable harm if it can "demonstrate [ ] a significant risk that [it] will experience harm that cannot adequately be compensated after the fact by monetary damages." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484–85 (3d Cir.2000). The Third Circuit held in *Novartis* that "[i]n a competitive industry where consumers are brand-loyal, ... loss of market share is a potential harm which cannot be redressed by a legal or an equitable remedy following a trial," and thus meets the test for irreparable harm. *Novartis*, 290 F.3d at 596 (quotations omitted). Additionally, a number of courts have held in Lanham Act cases that "[w]here the challenged advertising makes a misleading comparison or reference to a competitor's product, irreparable harm is presumed." *Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharms. Co.*, 129 F.Supp.2d 351,

---

**5.** Nor do we expect that such a claim could be proved. As GSKCH's expert Dr. Jack Henningfield testified, trouble sleeping is a withdrawal symptom commonly suffered by all people who attempt to quit smoking, irrespective of the means they employ to relieve themselves of their addiction. (7–11–03 H'g Tr. at 64, 69.)

**6.** The court in *Novartis* did not explicitly state how much of a factual basis an advertising

claim must have before the burden is imposed on the complainant. The court said only that "a completely unsubstantiated advertising claim by the defendant is *per se* false without additional evidence from the plaintiff to that effect." *Novartis*, 290 F.3d at 590. However low the threshold, though, we are confident that zero substantiation, which Pharmacia presents, renders a claim per se false.

367 (D.N.J.2000), *aff'd*, 290 F.3d 578 (3d. Cir.2002) (citing *McNeilab, Inc. v. Am. Home Prods. Corp.*, 848 F.2d 34, 38 (2d Cir.1988)). *See also Barmasters Bartending Sch., Inc. v. Authentic Bartending Sch., Inc.*, 931 F.Supp. 377, 386–87 (E.D.Pa.1996); *J&M Turner, Inc. v. Applied Bolting Tech. Prods.*, No. 95–2179, 1996 WL 32114, at *12 (E.D.Pa. Jan.26, 1996), *aff'd*, 96 F.3d 1433 (3d Cir.1996); *Performance Indus., Inc. v. Koos, Inc.*, No. 90–6435, 1990 WL 161253, at *6 (E.D.Pa. Oct.17, 1990). "The presumption is provided because courts assume that a false direct comparison necessarily harms the goodwill of the victimized firm, and therefore constitutes irreparable harm." *J&M Turner*, 1996 WL 32114, at *12.

▉ We first address Pharmacia's contention that GSKCH cannot demonstrate irreparable injury because GSKCH waited over two months from the time "Trying to Quit" was first aired before it moved for injunctive relief. This long delay, Pharmacia contends, belies any claim that GSKCH faces irreparable injury without injunctive relief. Thus, the injunction should not issue.

▉ Pharmacia is correct that "delay is relevant in assessing irreparable harm," and that a preliminary injunction may be an inappropriate remedy where the non-movant provides proof of the movant's "unexplained delay." *Sunquest Info. Sys., Inc. v. Park City Solutions, Inc.*, 130 F.Supp.2d 680, 698 (W.D.Pa.2000). *See also New Dana Perfumes Corp. v. Disney Store, Inc.*, 131 F.Supp.2d 616, 626 (M.D.Pa.2001) ("Thus, a presumption of irreparable harm flowing from a reasonable probability of success . . . may be destroyed by delay in seeking relief."). However, the circumstances surrounding GSKCH's delay in this case do not preclude a finding of irreparable injury. Pharmacia began airing "Trying to Quit" in mid-February 2003. (Pharm. Opp. Br.

at 18.) Apparently in response to objections made by GSKCH's attorneys, "Trying to Quit" was taken off the air on February 22, 2003. (7–8–03 Jaffe Dec. at ¶¶ 7–9; *Id.*, Ex. B.) Pharmacia did not tell GSKCH whether it intended to begin running the ad again. (*Id.* at ¶ 10.) GSKCH then filed a claim alleging "Trying to Quit" violated the Lanham Act on February 27, 2003. (Docket entry no. 63.) "Trying to Quit" went back on the airwaves on March 15, 2003, a fact learned by GSKCH shortly thereafter. (7–8–03 Jaffe Dec. at ¶ 12.) GSKCH then moved for a preliminary injunction on April 11, 2003. (Docket no. 67.) All throughout this period, from February to the date the motion was filed, Pharmacia and GSKCH were attempting to negotiate an extrajudicial resolution of this dispute. (GSKCH Rep. Br. at 23.)

We find that, at most, GSKCH tarried less than a month in moving for injunctive relief. GSKCH filed its counterclaim in February, but at that time the offending commercial was no longer being aired. Once the commercial was back on the air, GSKCH moved for injunctive relief with reasonable haste, given that it was simultaneously attempting to effect an out-of-court settlement of its claim. Pharmacia has not directed our attention to any case finding that a delay of 27 days estops a claim of irreparable injury. Nor do we wish to encourage knee-jerk motions for preliminary injunctions when a delay of less than a month might produce a solution without court intervention. We hold that GSKCH's delay does not preclude a finding of irreparable injury.

▉ We also find that GSKCH does face irreparable injury in the absence of injunctive relief. "Trying to Quit" is a comparative commercial, *see supra*, and thus to the extent that the law presumes irreparable harm in Lanham Act cases involving misleading comparative commer-

cials, GSKCH has met its burden on this issue.[7] However, we need not rest our decision on the presumption of irreparable injury, because the record demonstrates that GSKCH faces a significant risk of loss of its market share due to "Trying to Quit." It is undisputed that Nicotrol and NicoDerm are in direct competition in the NRT market. We find that by disparaging NicoDerm and heralding Nicotrol, "Trying to Quit" aims to reduce Nico-Derm's share of the NRT market. We further find that Pharmacia's own witness testified that during the period in which "Trying to Quit" was on the air, Nicotrol's market share rose significantly. (2d Horvath Dec., Ex. 1, at 123–24.) These findings establish a significant risk of harm to GSKCH, because NicoDerm will likely lose market share if Pharmacia is free to continue to air "Trying to Quit." We hold that GSKCH has met its burden for this element of the preliminary injunction inquiry.

### b. *Harm to Pharmacia*

■ GSKCH must also demonstrate that the potential harm it faces without injunctive relief outweighs the harm Pharmacia will suffer should an injunction issue. The Third Circuit reiterated in *Novartis* that "the injury a defendant might suffer if an injunction were imposed may be discounted by the fact that the defendant brought that injury upon itself." *Novartis*, 290 F.3d at 596. The court therefore affirmed the district court's holding that "because [the plaintiff] has established a likelihood of success [on its false advertising claim], [the defendant] cannot claim any legal entitlement to any economic benefits resulting from such false advertising."

*Novartis*, 129 F.Supp.2d at 369. Any financial loss caused by the injunction, the district court continued, "is self-imposed." *Id. See also Sweetzel, Inc. v. Hawk Hill Cookies, Inc.*, No. 95–2632, 1995 WL 550585, at *16 (E.D.Pa. Sept.14, 1995) ("The burden [of enjoining defendants' false advertising] on defendants is slight; defendants have no right to misrepresent . . . to gain a competitive advantage.").

We find the above analysis applicable to this case. To the extent Pharmacia would be injured by an injunction against showing "Trying to Quit," that injury would have been caused by Pharmacia's own misconduct in making the two false claims contained in the commercial. The Court therefore discounts any such harm.[8] The likely loss of market share GSKCH faces without injunctive relief outweighs any harm to Pharmacia caused by granting preliminary relief.

### III. *Public Interest*

■ The final factor in the preliminary injunction inquiry is whether "the public interest favors issuing the injunction." *Novartis*, 290 F.3d at 597. GSKCH contends that enjoining "Trying to Quit" is in the public interest because the commercial's alarmist focus on the sleep disturbances caused by NRTs will discourage people from trying to quit smoking. The Court finds this argument unconvincing. While the commercial does draw attention to sleep disturbances, it also sings the virtues of a product that has been proven to have a low incidence of sleep disturbances, Nicotrol. We believe GSKCH's true objection to this commercial is that it

---

**7.** We also note that in another phase of this litigation Pharmacia itself has taken the position that irreparable harm should be presumed once a party has shown a likelihood of success on a claim that a comparative commercial violates the Lanham Act. (Pharma. Proposed Findings of Fact and Conclusions of

Law in Supp. of Pharm. Mot. for Prelim. Inj. at 51.)

**8.** We further note that Pharmacia has not alleged that it would be injured by an injunction.

will make consumers less likely to try to quit smoking with NicoDerm. While avoiding this outcome is a strong interest of GSKCH's, it is not necessarily shared by the public at large.

■ The Court nevertheless finds that enjoining "Trying to Quit" would serve the public interest. There is a strong public policy against the dissemination of false and misleading advertising, especially in the context of OTC drug advertising. *See, e.g., Novartis,* 290 F.3d at 597 (agreeing with "those district courts that have found that there is a strong public interest in the prevention of misleading advertisements, and this interest is particularly strong where over-the-counter drugs are concerned") (quotations omitted). Further, we observe that "where the [movant] has demonstrated a likelihood of success on the merits, the public interest leans even more toward granting the injunction." *Id. See also Advance Magazine Publishers Inc. v. Vogue Int'l,* 123 F.Supp.2d 790, 802 (D.N.J.2000) ("Once the likelihood of success on the merits and irreparable injury to plaintiff have been amply demonstrated … it will almost always be the case that the public interest will favor injunctive relief.") (quotations omitted). We therefore hold that enjoining "Trying to Quit" because of its false claims is in the public interest.

### CONCLUSION

GSKCH has established the four elements predicate to the issuance of a preliminary injunction. The Court is convinced that "Trying to Quit" likely violates the Lanham Act, GSKCH will be irreparably harmed if Pharmacia continues to air it, Pharmacia will not be significantly harmed by an injunction, and the public interest is served by enjoining the ad.

The Court will therefore grant GSKCH's motion.