NEW DANA PERFUMES CORP., New Tinkerbell Inc., St. Honore Holding Inc. and Finanz St. Honore, B.V., Plaintiffs,

v.

THE DISNEY STORE, INC. d/b/a The Disney Store, Defendant.

No. 3:CV–00–1345.

United States District Court, M.D. Pennsylvania.

Jan. 29, 2001.

James H. Heller, Mary Craine Lombardo, Michele A. Ledo, Robert W. Hayes, Michael B. Fein, Cozen & O'Connor, Philadelphia, PA, for New Dana Perfumes Corp., New Tinkerbell, Inc., St. Honore Holding, Inc., Finanz St. Honore, B.V.

Michael P. Perry, O'Malley & Harris, P.C., Scranton, PA, Bonny B. Plosker, Pa-

squale A. Razzano, Bonnie B. Plosker, Fitzpatrick Cella Harper & Scinto, New York, NY, for The Disney Store, Inc.

## MEMORANDUM

VANASKIE, Chief Judge.

On July 28, 2000, plaintiffs New Dana Perfumes Corporation, New Tinkerbell Inc., St. Honore Holding Inc. and Finanz St. Honore B.V. (collectively referred to at times as "New Tinkerbell") brought this action against the defendant, The Disney Store, asserting claims of trademark infringement under federal and state law, dilution of trademark under 15 U.S.C. § 1125(c), and unfair competition under Pennsylvania state law. The New Tinkerbell plaintiffs, which market a line of children's cosmetics, fragrances and accessories under the registered trademark "Tinkerbell ®," contend that The Disney Store's marketing of products with the name "Tinker Bell" or "Tink," or with the character image of Tinker Bell from the Disney movie "Peter Pan," violates their trademark rights. Additionally, the New Tinkerbell plaintiffs contend that The Disney Store has violated its license in the trademark "Heaven Sent ®" by selling a children's perfume named "Heaven Scent."

On August 1, 2000, New Tinkerbell moved for a preliminary injunction, requesting that the Court restrain The Disney Store "from using, in commerce, the mark 'Tinkerbell,' any reproduction, counterfeit, copy or colorable imitation of Tinkerbell, including but not limited to 'Tink,' 'Tinker Bell' *or a female fairy symbol known as 'Tinkerbell,'* in connection with the sale, offering for sale, distribution, importation or advertising of *any product* or apparel *except* those products which are, by themselves, *exact replicas of Disney's copyrighted character 'Tinkerbell.'* " (Proposed Order for Preliminary Injunction submitted by plaintiffs' counsel on or about November 22, 2000; emphasis added.) Plaintiffs make this blunderbuss request for extraordinary relief despite the fact that The Disney Store and affiliated Dis-

ney entities have sold products bearing Disney's depiction of the fairy image, and, at times, the name of the fictional character Tinker Bell since Disney released the animated movie Peter Pan in 1953. Prior to moving for a preliminary injunction, neither the plaintiffs nor their predecessors ever objected to the use by The Disney Store or any Disney company of the image of Tinker Bell on any products sold at Disney theme parks, hotels and stores. Moreover, *plaintiffs waited more than one year after concluding that The Disney Store was infringing their registered trademark and six months after sending to The Walt Disney Company's Chief Executive Officer a cease and desist letter (which concerned only the use of the character name) before asking for relief that would remove from any product but figurines in over 500 Disney Stores not only the word Tinkerbell, but also the image of the Disney character.*

The fact that The Disney Store has sold products and apparel bearing the image and, at times, name of the fictional character for a number of years without objection from plaintiffs and their predecessors, coupled with the plaintiffs' delay in seeking a preliminary injunction, preclude a finding of immediate irreparable harm necessary to warrant the extraordinary relief sought here. Moreover, plaintiffs have not demonstrated a likelihood of prevailing on their request for expansive relief concerning the use of the Disney depiction of Tinker Bell, by which The Disney Store seeks to exploit customer affinity for the Disney character. Accordingly, the New Tinkerbell plaintiffs will not be afforded a preliminary injunction as to the registered trademark "Tinkerbell ®."

Plaintiffs also are not entitled to a preliminary injunction with respect to bottles of perfume labeled "Heaven Scent" that were included in a boxed package of children's perfumes sold by The Disney Store. The evidence shows that The Disney Store did not promote the labeled bottle in ques-

tion and that, in any event, it has discontinued its sale. Accordingly, plaintiffs' motion for a preliminary injunction will be denied.

## I. FINDINGS OF FACT

### A. The Tinkerbell ® Trademark

Tinker Bell originated as a character in the 1911 play and 1921 novel titled "Peter and Wendy" authored and copyrighted by Sir James Matthew Barrie. After Barrie's death, the Barrie copyright to the "Peter Pan" works was left to the Hospital for Sick Children of London, England.

In 1952, Myron Greenfield founded Tom Fields (UK) Ltd. for the purpose of selling and manufacturing a line of children's cosmetics and toiletries. After learning the trademark rights to "Tinker Bell" were available, Tom Fields paid an honorarium to the Hospital for Sick Children and began to use the trademark "Tinkerbell" in connection with its children's cosmetics product line. Tom Field's earliest products included: lip pomade in a folding box with a mirror, powder mitt, toilet water, hand lotion, bubble bath, dressing table, soap, cologne, bath powder, jewelry box (which contained cologne, lotion, bubble bath and powder mitt) and a traveling suitcase (which contained lipstick, cologne, and soap).

Tom Fields filed its registration of the Tinkerbell ® mark with the United States Patent and Trademark Office (USPTO) on March 27, 1952. The trademark was for use on Class 3 products—toilet water, bubbling bath preparation, hand lotion and bath powder. The registration was accepted on October 12, 1954. Tom Fields (and subsequently MEM) acquired additional registrations of the Tinkerbell ® mark for a number of goods, including: soap, lip pomade, nail polish, nail polish remover, cologne, bath oil, body lotion, body powder, blue jeans, bath oil, dusting powder, shampoo, tote bags, cosmetic cases, jewelry (not made of precious metal), sunglasses, stationery, wallets, purses, pillow and pajama bags, umbrellas, sheets and pillow cases, barrettes, ponytail holders, apparel, dolls, combs, brushes, and wound dressings. For each registration, Fields filed the appropriate affidavits with the USPTO to verify its continued use pursuant to 15 U.S.C. § 1058 and to register it as an incontestable mark under 15 U.S.C. § 1605.

In 1967, MEM Company Inc. (MEM) acquired the rights and associated goodwill in the Tinkerbell ® trademark. MEM assigned some of the rights in the trademark to Martin Freres Inc. and English Leather, Inc., wholly-owned subsidiaries of MEM. Myron and Martin Greenfield continued to operate Tom Fields under MEM's ownership until 1981 and 1996, respectively.

In 1996, Renaissance Cosmetics, Inc., and its wholly-owned subsidiary Dana Perfume Corporation acquired MEM. The acquisition included the rights in the trademark Tinkerbell ®. On June 2, 1999, Renaissance filed petitions for relief under Chapter 11 of the United States Bankruptcy Code in the United States District Court for the District of Delaware. The Bankruptcy Court subsequently signed an order approving the auctioning of the Renaissance assets (including trademarks and other intellectual property). On June 28, 1999, non-party DPC Acquisition Corporation and Renaissance entered into an Asset Purchase Agreement by which DPC purchased certain assets of Renaissance, including all property, title and interest in the trademark Tinkerbell ®. After acquiring the Renaissance assets, DPC formed New Tinkerbell as a DPC subsidiary to receive assets of Renaissance's Tinkerbell subsidiary. New Tinkerbell was to conduct the business of selling, *inter alia*, children's products and apparel bearing the Tinkerbell ® trademark.

### B. Product Sales under the Tinkerbell ® Trademark

From 1952 to the present, the holders of the Tinkerbell ® trademark have continu-

ously sold children's cosmetics, toiletry products and related accessories, like grooming items, bearing the Tinkerbell ® mark. Examples of such products include: lipstick, bubble bath, bath bubbles, hand care, nail polish, lip gloss and combination sets of such items. Other products occasionally sold with the Tinkerbell ® mark included shoulder bags, tote bags, fashion sets, purses, magic wands, wallets and jewelry. Items such as purses were often packaged with accompanying cosmetic or toiletry items.

Starting in the 1960's, the Tinkerbell ® mark was accompanied by a fairy image, which has changed dramatically over the years. The original figure was a black and white image of a fairy in a dress with wings. In the 1970's, the image, drawn in black and white, resembled a little girl in a dress, wearing a bonnet and carrying flowers. The image again was transformed in the early eighties, when the fairy was depicted in color with long blonde hair, a flowing red dress, wings and carrying a wand, or resting in a cloud in a red jumpsuit. In the late eighties and early nineties, the image was further modified to a fairy figure wearing a long blue dress with wings and a wand; the depictions of the fairy included both an African American fairy with dreadlocks and a crown, and a blonde-hair, blue-eyed fairy with a garland of flowers in her hair. The current fairy image was created in 1997. That image, which appears on the plaintiffs' packaging, is a fairy figure with blonde hair in a ponytail, blue eyes, a short blue dress, wings, slippers, and carrying a wand. The latest version of the image used by plaintiffs bears a striking resemblance to the depiction of Tinker Bell in the animated

movie Peter Pan.[1] New Tinkerbell's fairy image is not registered as a trademark.

Until the late nineties, plaintiffs packaged their products in pink packaging. Today, the plaintiffs use both pink and purple packaging. The name Tinkerbell ® appears predominantly on the top of the package, accompanied by a small depiction of the fairy image.

The Tinkerbell ® products have been marketed and sold at supermarkets, toy stores, national retail chains, department stores and drug stores. The products have also been sold at military exchanges and at amusement parks. In this regard, Disney purchased products from plaintiffs' predecessors for resale at Disney's theme parks and hotels. Neither plaintiffs nor their predecessors, however, sold any products for resale by The Disney Store, and The Disney Store never displayed products of the plaintiffs or their predecessors bearing the Tinkerbell ® mark. New Tinkerbell and its predecessors have traditionally advertised their Tinkerbell ® line of products in women's and parenting magazines (e.g., McCall's, Redbook, Good Housekeeping, Parenting), as well as trade magazines. On a few occasions, plaintiffs' predecessors advertised in Disney publications.

Sales figures of the Tinkerbell ® product line steadily increased from 1952 to 1988, when sales reached a peak of $ 18 million. Since 1988, sales of plaintiffs' Tinkerbell product line have declined significantly, to the point that sales in 1999 were only $ 1.5 million.[2]

## C. The Heaven Sent ® Trademark

On October 13, 1987, Helen Rubenstein Inc. registered the trademark Heaven

---

1. A copy of Defendant's Exh. ("DX") 5 showing the evolution of the image used by New Tinkerbell and its predecessors and comparing New Tinkerbell's current image with the Disney character is attached to this opinion as Appendix "A."

2. The following were the approximate net U.S. sales figures for the years 1989 to 1999:

| | |
|---|---|
| 1989 | $16,000,000 |
| 1990 | $14,500,000 |
| 1991 | $15,500,000 |
| 1992 | $10,000,000 |
| 1993 | $ 8,000,000 |
| 1994 | $ 8,000,000 |
| 1995 | $ 8,000,000 |
| 1997(fiscal) | $ 7,000,000 |
| 1998(fiscal) | $ 4,500,000 |
| 1999(fiscal) | $ 1,500,000 |

Sent® with the USPTO. In June 1993, Rubenstein filed the necessary affidavits to verify the trademark's continued use and to register it as an incontestable mark pursuant to 15 U.S.C. § 1058 and 15 U.S.C. § 1605. The USPTO accepted the mark as an incontestable mark on September 23, 1993.

Before registering the mark in 1987, Rubenstein had granted an exclusive license to Allegheny Pharnaco Corporation in 1980 to use the trademark in connection with the design, marketing, advertising and sale of perfume and related products. Allegheny granted a sublicense to MEM to use the trademark in 1982.

As discussed above, MEM was acquired by Renaissance and its wholly owned subsidiary Dana, which was in turn acquired by DPC. Dana was renamed New Dana Perfumes, and the exclusive license for Heaven Sent® was assigned to New Dana. On July 27, 2000, Parbel of Florida (the current trademark owner), Alleghany (the licensor) and New Dana (the licensee) entered into an agreement which permitted New Dana to enforce the Heaven Sent trademark against Disney. New Dana and its predecessors have sold perfume and related products bearing the Heaven Sent® trademark since 1992. Heaven Sent® perfume is marketed to an adult/pre-adult audience.

The Heaven Sent® products have been sold nationally in supermarkets and drug stores. Advertising has included advertisements in trade publications, brochures in local papers and promotional advertising in store circulars.

### D. *The Disney Store and Disney's Tinker Bell Character*

The Disney Store, a wholly-owned subsidiary of Disney Enterprises Inc., was founded in 1987. The original store opened in Glendale, California. Today, there are approximately 500 Disney Stores in the United States and 740 stores worldwide. The Disney Store sells products bearing the image, and sometimes the name, of characters from Disney motion pictures or other Disney productions. Consumers shop at The Disney Store for the purpose of purchasing items which bear a particular character's name or image. All character-affiliated products sold at The Disney Store bear an image or likeness of a Disney character. In this manner, The Disney Store exploits the affinity its customers have with characters depicted in Disney productions.

### E. *Disney's Tinker Bell character*

On February 5, 1953, Walt Disney Productions released the motion picture "Peter Pan" based upon the Barrie play. In the movie, Disney depicted the character "Tinker Bell" as a sprite or pixie.

Disney's Tinker Bell character is depicted as a fairy-like figure with blonde-hair in a ponytail, blue eyes, wearing a green dress, green slippers and wings, and sometimes carrying a wand. (See DX–5 attached hereto as part of Appendix "A.") The Tinker Bell image from the Peter Pan movie is copyrighted. Disney typically spells the character's name with two words: Tinker Bell (rather than Tinkerbell).

At about the time the Peter Pan movie was released in 1953, Walt Disney Productions began using the name and image of Tinker Bell in conjunction with various products. Those products included, but were not limited to, children's costumes, dolls, shoes, scarfs, jewelry, children's clothing, purses and shoulder bags. Most of the products used only the copyrighted image of the Tinker Bell character. The Tinker Bell image was one of several character images on many of the products. Some products, such as the scarf and shoulder bag, included both the image of the Disney character and the name Tinker Bell. Advertisements for these products were placed in national newspapers and magazines.

In 1955, the Disneyland theme park opened in Anaheim, California. In 1957,

the "Tinker Bell Toy Shop" opened at Disneyland. In 1971, the "Tinker Bell Toy Shop" opened in the Magic Kingdom at the Walt Disney World Resort in Orlando, Florida. That store was re-named to "Tinker Bell's Treasures" in 1992. From the parks' inception, various Disney character items were sold at the shops, including items depicting the Tinker Bell character. Products with the Disney Tinker Bell image sold at Disney's theme parks and hotels included, but were not limited to, bells, figurines, viewmasters, pens, T-shirts, jewelry, dolls, watches, ornaments, wands, pixie dust, pens, pencils, magnets, clothing and bags.·

Besides the two theme parks, Disney has marketed Tinker Bell character items since at least 1993 through the Disney Catalog. Tinker Bell items which have been advertised in the catalog have included, but are not limited to, costumes (1993–94, 2000), wands and pixie dust (1993), sculpture (1993), figurines (1993—1995, 2000), children's clothing (1994, 2000), adult clothing (2000), dolls (1994), swimsuits (1994), jewelry (1994, 2000), watches (1994, 1998, 2000), note cards (1994), sericels (1994, 1998, 2000), and collector plates (1994, 1995, 1998, 2000).[3]

Tinker Bell products have been sold at The Disney Store since it first opened in 1987. During 1990–1995, the following were some of the items bearing the Disney Tinker Bell image that were available at the Disney Store: toys, figurines, T-shirts, souvenir items, dolls, dress-up kits and snow globes. Some of these items, including the figurines, dolls and dress-up kits, carried the name "Tinker Bell" or "Tink," either on the product or the packaging. From 1995 through 1998, the Disney Store

offered the following additional items in their Tinker Bell line: sericels, plates, stationery, sweatshirts, adult apparel, swimwear, sleepwear, watches and costumes. It is undisputed that in 1998 and 1999 The Disney Store sold costumes, wands, shoes, crowns, swimsuits and T-shirts bearing the Disney image of Tinker Bell. (Defendant's Proposed Findings of Fact at ¶ 19.)[4] In 1999 and 2000, products sold at the Disney Store depicting the image of Tinker Bell and/or the name Tink, Tinkerbell or Tinker Bell, included: postcards, ornaments, pins, frames, jewelry, diaries, stamping kits, pens, stickers, watches, children's clothing, adult clothing, shoes, costumes, bubble glasses, towels, candles, snow globes, handbags, backpacks, swimsuits, and nail polish.

For The Disney Store's fiscal year ending September 30, 2000, products bearing Disney's depiction of the character Tinker Bell exceeded $16 million. While sales figures by character for the fiscal year ending September 30, 1999 are incomplete, it appears that The Disney Store sold at least $6 million in Tinker Bell products, and as much as $16 million. (Cox Supplemental Decl.)[5]

The Disney Store introduced its pre-teen Tinker Bell product line in July of 2000. The product line included T-shirts, stationery items, bracelets, clothing, beads, backpacks, handbags and pre-teen cosmetics (such as lip gloss and nail polish). This product line, especially the cosmetics and personal grooming products, parallel the New Tinkerbell offerings. In fiscal year 1999, before the introduction of the pre-teen line, The Disney Store carried the following product types with the Tinker

---

3. Of course, more than one catalog issue was distributed each year, so that the Tinker Bell related items would have been promoted in several catalogs each year. For example, a "Tinker Bell Costume" was offered in 20 separate catalogs. (McDonough Decl.) It is estimated that millions of catalogs have been distributed since 1992, and sales of Tinker–Bell related items through the Disney Catalog total millions of dollars.

4. This proposed finding of facts is accompanied by the designation "U," signifying it is undisputed.

5. Sales figures by character for earlier years are reportedly unavailable.

Bell character image or both her image and name: frames, ornaments, key rings, pins, batons, jewelry, diaries, zipper kits, flip cases, notepads, activity kits, stamp kits, pens, bubble glasses, watches, children and adult apparel, wands, costumes, shoes and cookie jars.

In 2000, as part of Disney's pre-teen product line, Disney began advertising and distributing a jewelry-type box with a mirror under the cover containing children's bath and body products. The bottles all contain the name "Pixie Glam" and one of the bottles also contains the name "Heaven Scent." The Disney Store did not specifically promote the product labeled "Heaven Scent." The name was chosen by Disney's supplier. The Disney Store is no longer marketing the jewelry box containing the Heaven Scent Product. Disney sold approximately 2500 units of the jewelry box at a price of $15.00.

All of the Tinker Bell related items sold at The Disney Store have borne Disney's copyrighted depiction of the character, or some part thereof. Although Disney has a copyright on its depiction of Tinker Bell, it has not attempted to register a trademark for "Tinker Bell" or its image of the character.

Subsequent to the filing of this lawsuit, The Disney Store discontinued its pre-teen product line, which had included items bearing the Disney image and, on some products, the name of Tinker Bell. No evidence has been presented as to the volume of sales generated by that aspect of the pre-teen line that bore Disney's image and/or name of the fictional character, Tinker Bell.

### F. *Plaintiffs' Knowledge of Alleged Infringement*

The plaintiffs and their predecessors have been aware of Disney's character Tinker Bell and the marketing of Tinker Bell products at the Disney theme parks since the 1950s. In the 1950's, Disney contacted Tom Fields and suggested that Tom Fields use Disney's Tinker Bell image on the packaging of Tom Fields' Tinkerbell ® product line, and pay a licensing fee to Disney. Myron Greenfield rejected Disney's offer.

During the time when Tom Fields owned the Tinkerbell trademark, Martin Greenfield initiated discussions with Disney about the possibility of a joint venture between Disney and Tinkerbell. During these discussions, Greenfield suggested that Tom Fields' Tinkerbell ® trademark and Disney's character would be a perfect fit for the sale of children's products. The venture did not come to fruition.

From the 1970's through February of 1999, New Tinkerbell's predecessors sold children's products with the Tinkerbell ® trademark to Walt Disney Company and Walt Disney Enterprises for resale at the Disneyland and Walt Disney World theme parks. The products included, but were not limited to, children's body sprays, body glitter, talcs, lotions, cosmetics, nail products, stickers, hair products, jewelry, sunglasses, purses, pencil kits, dolls, costumes and wands. New Tinkerbell and its predecessors did not sell to Disney for resale at its theme parks such items as T-shirts and other apparel, watches, ornaments, viewmasters and bells that carried Disney's depiction of Tinker Bell. Instead, Disney procured these items from other sources and sold them along with plaintiffs' products at the retail outlets in Disney theme parks and hotels.

Representatives from Tom Fields and MEM—Kim Wright, Martin Greenfield and Gay Mayer—visited the Disney theme parks and the stores at the parks which contained the Tinkerbell ® items being sold. Although noticing that Disney also sold Tinker Bell products that were not sold by Tom Fields, they raised no objection. Plaintiffs explain that they failed to object because the products were items for which Tom Fields did not hold a trademark registration, the item depicted only Disney's Tinker Bell character, not the

word Tinkerbell,[6] or the category of items was too small to warrant bringing legal action.

In the 1990's, plaintiffs' predecessors registered a few written objections with Disney concerning use of the word "Tinkerbell" in connection with a few products. For example, by letter dated February 18, 1992, plaintiffs' predecessors objected to the use of the word "Tinkerbell" on packages containing wands and wings sold at The Disney Stores in Great Britian. No objection, however, was voiced with respect to the inclusion of the Disney depiction of Tinker Bell, which appeared prominently on the packaging for the wands and wings. Furthermore, plaintiffs' predecessors did not, at that time, undertake any investigation as to the sale of such products in The Disney Stores in the United States, even though a representative of The Disney Store in London informed plaintiffs' predecessors that the wings and wands were sold not only in the United Kingdom, but also in the United States. Indeed, plaintiffs' predecessors failed to investigate sales in the United States in The Disney Stores notwithstanding advice from a British representative of plaintiffs' predecessors, who asserted:

> Disney know[s] they have no rights to the name and should be stopped forthwith otherwise we will, by our inaction, allow others to follow on the same course.

(Mayer Dep. at 170–74, Exh. 50.) Eventually, the matter in Great Britain was resolved with an informal agreement by The Disney Store to discontinue "uses of the word TINKERBELL in the U.K. in relation to toys and clothing . . .," and with the further understanding that existing stocks of allegedly offending products could be sold. (*See* September 30, 1993 letter of Disney representative, included as part of Exhibit 2 to Plaintiffs' Reply Brief.)

In April of 1994, an attorney representing plaintiffs' predecessors complained of the sale of a doll called "Flying Tinker Bell" at The Disney Stores in the United States. Once again, the objection was only to the use of words, not to the images. The April 26, 1994 cease and desist letter, referencing the resolution of the United Kingdom complaint, stated that it was anticipated that Disney "will agree to cease using the trademark in this country, as well." [7] By letter dated June 22, 1994, Disney's counsel asserted that use of the Tinker Bell name on the doll did not infringe plaintiffs' mark and that, while Disney "did in fact agree to discontinue the use of the TINKERBELL name in the United Kingdom on dolls and certain clothing items, that decision was reached as a matter of expedience and there was never any discussion or implication that the agreement in the United Kingdom would extend to other territories." (*Id.*) By letter dated July 27, 1994, counsel for plaintiffs' predecessors renewed the contention that use of the name "Tinkerbell" on the packaging for the doll infringed the registered ·trademark. (*Id.*) No further action, however, was taken by plaintiffs' predecessors on this matter. Plaintiffs' predecessors apparently conducted no further investigation of The Disney Store's continued activities, and there is no evidence that The Disney Store stopped the accused activity. (Mayer Dep. at 179–83.)

The only other evidence of efforts to enforce the Tinkerbell trademark vis a vis Disney or The Disney Store prior to this matter is an exchange of correspondence in early 1998 concerning the sale of clothing for children in the United Kingdom. The "swing ticket" on an allegedly offending party dress bore the name "TINKERBELL." In response to the complaint, Disney placed stickers reading "From Dis-

---

**6.** It was not until this lawsuit was filed that New Tinkerbell articulated the position that use of Disney's image of the Tinker Bell character infringed its mark. New Tinkerbell's predecessors did not take this position.

**7.** The April 26, 1994 letter is included as part of Exhibit 2 to Plaintiffs' Reply Brief.

ney's masterpiece Peter Pan" over the word Tinkerbell on the product labeling. Apparently, this voluntary action on the part of The Disney Store in England resolved the matter, as there is no evidence that further action was taken on the part of plaintiffs' predecessors. There is no evidence that plaintiffs' predecessors took any action at that time with respect to sales of products in the United States.

### G. *New Tinkerbell's Delay in Instituting Legal Action*

Plaintiffs concede knowledge of The Disney Store's sales of allegedly infringing products bearing the Disney image and/or name Tinker Bell since at least October of 1999. In this regard, plaintiffs' CFO Anthony Wesley visited The Disney Stores from the Fall of 1999 through the Summer of 2000 and saw products such as bubble bath, body care items, clear bags with nail polish, T-shirts, sleepwear, backpacks, pencil cases, dolls and costume sets that used either the name Tinker Bell, the name "Tink," or the image of Disney's character.[8] By the end of October of 1999, plaintiffs' in-house counsel was asked to investigate the possibility of infringement by Disney. (Cowger Dep. at 58–61.) Cowger quickly concluded that The Disney Stores in the United States were selling products that Cowger believed infringed plaintiffs' trademark. It was not until mid-January, 2000, however, that plaintiffs sent a "cease and desist" letter to Michael Eisner as Chief Executive Officer of The Walt Disney Company. The January 14, 2000 letter did not identify any specific products, and concerned only "use of the name covered by the trademark....." By letter dated February 18, 2000, Mr. Cow-

ger wrote to Steve Ackerman of The Walt Disney Company, referencing communications between Mr. Ackerman and Rose Evangelista, President of New Tinkerbell, Inc. The February 18, 2000 letter did not voice any complaint with respect to Disney's use of its character image. According to Ms. Evangelista, the last communication with a representative of The Disney Store pertaining to this matter occurred on or about March 1, 2000. (Evangelista Dep. at 87–88.) There is no documentation of any active negotiations occurring after that date. On July 28, 2000, almost five months after negotiations ended, plaintiffs brought this suit. Their motion for preliminary injunction followed on August 1, 2000.

### II. *PROCEDURAL HISTORY*

By Order dated August 8, 2000, a telephonic conference on plaintiffs' motion for preliminary injunction was scheduled for August 14, 2000. On that date, plaintiffs filed a brief in support of their motion, along with exhibits, and the Court entered an order for expedited discovery. The Disney Store, after obtaining two extensions of time, filed its brief in opposition to the motion for preliminary injunction and exhibits on September 25, 2000. A hearing on the motion was held on October 26, 2000. By agreement of the parties, the hearing was limited to presentation of oral argument, with a comprehensive evidentiary record consisting of deposition transcripts, numerous exhibits, and declarations of various witnesses submitted by the parties. In accordance with the Court's directive, proposed findings of fact were submitted by each side on November 9, 2000. This matter is ripe for disposition.[9]

---

**8.** Plaintiffs claim that each of these products infringe its registered trademark.

**9.** Also ripe for consideration is plaintiffs' motion to strike defendant's proposed findings of fact and the supplemental declaration of Christine Cadena. Plaintiffs object to the inclusion of several charts as attachments to the proposed findings of fact. While conclusorily asserting that the charts are inaccurate, plain-

tiffs provide no specifics as to this assertion. In any event, the inclusion of charts to summarize the evidence is neither unfair nor outside the scope of the Court's directive for the filing of proposed findings of fact. Plaintiffs' characterization of a number of defendant's proposed findings of fact as conclusions of law also does not warrant striking defendant's submission. As to the Cadena supplemental

## III. DISCUSSION

■ "Preliminary injunctions are an extraordinary remedy, and are discretionary with the trial judge." *Orson, Inc. v. Miramax Film Corp.*, 836 F.Supp. 309, 311 (E.D.Pa.1993). To obtain a preliminary injunction, the moving party must demonstrate (1) a reasonable probability of prevailing on the merits; (2) a probability of immediate irreparable harm if relief is denied; (3) the hardship to the non-moving party is not greater than the harm avoided by the moving party; and (4) preliminary injunctive relief is in the public interest. *Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 158 (3d Cir.1999). If either likelihood of success on the merits or a probability of immediate irreparable injury is not established, a preliminary injunction will not issue. *See Binney & Smith v. Rose Art Industries*, Civ. A. No. 00–2939, 2000 WL 1868378, at *1 (E.D.Pa. Dec.21, 2000).

### A. Plaintiffs' Claim of Trademark Infringement with Respect to the Tinkerbell ® Mark

■ In this case, the preliminary injunction tests must be assessed in the context of plaintiffs' claim that its mark has been infringed by not only the use of the words "Tinker Bell," but also by the use of the Disney depiction of that fictional character on its products. Given Disney's nearly 40 year use of its depiction on a wide variety of products, from costumes and toys to adult clothing and collector items, with the knowledge of plaintiffs and their predecessors, and in light of the evidence that The Disney Store has sold items bearing the Tinker Bell image, and sometimes also the character's name, since its inception in 1987, the need for urgent relief proclaimed by plaintiffs is lacking.

"Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil 2d* § 2948.1 (1995). In the trademark infringement context, a demonstration of a likelihood of prevailing is often regarded as establishing a probability of irreparable harm on the theory that "a lack of control over the use of one's own mark amounts to irreparable harm." *Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.*, 212 F.3d 157, 169 (3d Cir.2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 760, 148 L.Ed.2d 662 (2001). But, "[p]reliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985). Thus, a presumption of irreparable harm flowing from a reasonable probability of success in proving trademark infringement may be destroyed by delay in seeking relief. *See American International Group Inc. v. American International Airways, Inc.*, 726 F.Supp. 1470, 1481 (E.D.Pa.1989).

In *Citibank, supra*, the district court granted preliminary injunctive relief after finding that plaintiffs were likely to succeed on the merits of their claim that defendants use of the word "Citytrust" infringed plaintiff's service mark, and that such likelihood of prevailing warranted a finding of irreparable harm. The Second Circuit reversed. Assuming that "plaintiff's likelihood of success is as clear as the district court concluded," *id.* at 275, the Second Circuit found that the extensive delay in applying for injunctive relief justified denial of a preliminary injunction for trademark infringement. In *Citibank*, the plaintiff delayed more than ten weeks after learning directly of the defendant's plans to use the term "Citytrust." Plaintiff had

---

declaration, I find that it fairly responded to evidence that plaintiffs did not disclose to defendant until shortly before the oral argu-

ments conducted on October 26, 2000. Accordingly, plaintiffs' motion to strike will be denied.

received indirect notice of the defendant's plans more than 9 months before it sought court intervention. Moreover, plaintiff was aware of defendant's use of the term "Citytrust" in advertising pre-dating the litigation by several years. There was also evidence that the plaintiff had, itself, opened operations in a sales territory established by the defendant, exposing itself to the very confusion about which it complained. In reversing the lower court's grant of a preliminary injunction, the Second Circuit explained:

> In sum, Citibank's delay in seeking injunctive relief against the opening of the Citytrust's Long Island office, along with the minimal likelihood of increased harm to Citibank's trademark in view of Citytrust's increased advertising in the New York media since at least 1982 and Citicorp's voluntarily having placed its mark in close proximity to Citytrust in 1978, forces us to conclude that plaintiffs failed to establish before the district court the irreparable harm necessary to authorize injunctive relief, and that granting the injunction constituted an abuse of discretion.

*Citibank*, 756 F.2d at 277.

In reaching this decision, the Second Circuit relied upon the Tenth Circuit's decision in *GTE Corp. v. Williams*, 731 F.2d 676 (10th Cir.1984). The evidence considered by the Tenth Circuit showed that the defendant had used the name "General Telephone" for approximately 8 years before GTE brought its action and sought preliminary injunctive relief. There was also evidence that GTE had known about the defendant's use of the mark for at least three years before bringing its suit or notifying the defendant of its objection to the use of "General Telephone." In reversing the district court's grant of a preliminary injunction, the Tenth Circuit found that GTE's delay was a decisive factor in concluding that the denial of relief would not result in immediate irreparable injury.[10]

In *Orson, supra,* Judge Giles found that a delay of fifty days after plaintiff acquired knowledge of infringement precluded a finding of irreparable harm. 836 F.Supp. at 312–13. In *ImOn, Inc. v. ImaginOn, Inc.,* 90 F.Supp.2d 345, 350 (S.D.N.Y.2000), the court found that a delay of approximately 18 weeks overcame any presumption of irreparable harm and tipped the balance of hardship clearly in favor of the defendant. In *Gidatex, S.r.L. v. Campaniello Imports, Ltd.,* 13 F.Supp.2d 417, 419–20 (S.D.N.Y.1998), the court found that an unexcused delay of 4½ months in seeking a preliminary injunction for alleged trademark infringement clearly belied any claim of irreparable injury.

In this case, the Disney image of the fictional character Tinker Bell has been displayed on products sold by Disney and its affiliates for almost 50 years. For much of this time, plaintiffs' predecessors permitted Disney to sell its Tinker Bell image-bearing products at theme park sites where Disney also sold plaintiffs' products. The sales from the theme parks can hardly be described as insubstantial. For the period ending September 30, 1999, sale of Disney Tinker Bell related products from one theme park site alone, Walt Disney World, exceeded $1 million. Plaintiffs do not complain about sales of allegedly infringing products from theme park sites, even though sales from the theme park

**10.** The Tenth Circuit was careful to distinguish between the defense of laches to a trademark infringement claim and the effect of delay insofar as preliminary injunctive relief is concerned. The court observed:

> '[W]hile laches may not be sufficient to bar a permanent injunction it may well be a bar to preliminary relief. A preliminary injunction is sought upon the theory that there is an urgent need for speedy action to protect the plaintiff's rights. By sleeping on its rights a plaintiff demonstrates that lack of need for speedy action and cannot complain of the delay involved pending any final relief to which it may be entitled after a trial of all the issues.'

*GTE Corp.,* 731 F.2d at 680, *quoting Gillette Co. v. Ed Pinaud, Inc.,* 178 F.Supp. 618, 622 (S.D.N.Y.1959).

sites of the very products that plaintiffs claim infringe its mark approximate New Tinkerbell sales for the most recent year available.[11] Moreover, to the extent that there may now be some confusion as to product source caused by the image on the product or its package, that confusion is clearly attributable to the plaintiffs. It is the plaintiffs who recently transformed the character used on its products to a sprite that bears a remarkable resemblance to the Disney depiction of Tinker Bell in the 1953 animated film, Peter Pan. For many years, plaintiffs' predecessors used the image of a young girl on its product packaging. Having changed that image to something resembling the Disney character, with knowledge of Disney's use of its character on products and packaging, plaintiffs cannot now be heard to claim that it is The Disney Store's sales of products bearing Disney's Tinker Bell that will cause plaintiffs irreparable harm.

Plaintiffs contend that the fact that their predecessors twice objected to Disney's use of the mark Tinkerbell ® shows that plaintiffs have been diligent in enforcing their rights and, therefore, may seek preliminary injunctive relief. Far from supporting plaintiffs' position, the evidence actually undermines claims of imminent irreparable harm.

The first documented occasion of an objection occurred in 1992. Significantly, plaintiffs' predecessors did not complain of Disney's use of its character on products sold at The Disney Stores. Instead, the objection was limited to the use of the word Tinkerbell on product packaging for merchandise sold in the United Kingdom, and the matter was resolved by discontinu-

ance of the use of that word on product packaging in the United Kingdom. Significantly, plaintiffs' predecessors were told at that time that the same allegedly offending products were being sold in the United States, but no action was taken by plaintiffs' predecessors with respect to The Disney Store in the United States. This evidence supports the following conclusions:

• Plaintiffs' predecessors did not conceive that the use of the Disney image of the Tinker Bell character infringed its trademark; and

• Plaintiffs' predecessors took no action to enforce its mark with respect to Disney's use of the word Tinkerbell on products being sold in the United States.

The second objection lodged by plaintiffs' predecessors concerned the sale of a doll called "The Flying Tinker Bell," sold by The Disney Store in the United States. This objection was raised in 1994. Again, plaintiffs' predecessors did not complain of the use of the Disney depiction of the Tinker Bell character. Significantly, plaintiffs' predecessors were informed that any agreement with respect to the word Tinkerbell pertaining to the 1992 matter were limited to the United Kingdom. Even more significantly, there is no evidence that the 1994 objection was resolved or that any enforcement action was taken on the part of plaintiffs' predecessors at that time.

In summary, the evidence of "enforcement" of plaintiffs' trademark reveals that, since at least 1992, plaintiffs' predecessors were aware that the word Tinkerbell was used on products sold by The Disney Store

---

11. Pointing out that up until March of 1999 Disney had purchased products from plaintiffs' predecessors for resale at its theme parks, plaintiffs assert that "customers had purchased the New Tinker Bell plaintiffs' products from at least 1971 until March of 1999 from Disney and are now being misled into purchasing Disney's competing products." (Reply Brief (Dkt. Entry 59) at 17–18.) This assertion ignores the unrefuted fact that The Disney Store, the only Disney entity sued

in this case, never carried any product line of plaintiffs or their predecessors. It is thus disingenuous for plaintiffs to suggest that The Disney Store is capitalizing on benefits derived from the sales of plaintiffs' products. If such exploitation of plaintiffs' good will is occurring, it is at the theme parks, where plaintiffs' and Disney's Tinker Bell products were sold side by side for years without objection.

in the United States, and that no action was taken by plaintiffs' predecessors. The evidence also shows that at no time prior to the commencement of this case did plaintiffs or their predecessors ever suggest that use of the Disney character on products sold at The Disney Store infringed the Tinkerbell ® mark.

Plaintiffs insist, however, that The Disney Store only recently expanded "exponentially" its sales of Tinker Bell-bearing products. Citing *Kellogg Co. v. Exxon Corp.*, 209 F.3d 562 (6th Cir.), *cert. denied*, —— U.S. ——, 121 S.Ct. 340, 148 L.Ed.2d 273 (2000), plaintiffs contend that they are entitled to rely on the doctrine of "progressive encroachment" to defeat a defense of laches.[12]

*Kellogg* is inapposite to the question of irreparable harm for at least three reasons. First, *Kellogg* was not decided in the context of a preliminary injunction motion. Instead, the appeals court considered the district court's finding of laches as a barrier to permanent injunctive relief. As noted above, the issue here is not whether laches defeats plaintiffs' claims on the merits; instead, the question here is whether delay belies plaintiffs' claim of an urgent need for speedy action to protect their rights. *See GTE Corp.*, 731 F.2d at 679. Thus, while *Kellogg's* discussion of

the doctrine of progressive encroachment is certainly instructive on the defense of laches, it has no bearing on the question of irreparable harm.

Second, Kellogg tailored its requested injunctive relief to "Exxon's" continued use of its cartoon tiger in connection with "food, beverages, and retail convenience stores." 209 F.3d at 574. In other words, Kellogg sought to prohibit only that infringement that purportedly attended Exxon's expansion into the retail convenience stores. In this case, by way of contrast, plaintiffs seek expansive preliminary injunctive relief that extends well-beyond their niche market of children's cosmetics and related accessories. In this regard, the preliminary injunctive relief sought by plaintiffs would preclude The Disney Store from selling *any* product that bore the image of Disney's depiction of Tinker Bell. Encompassed within the relief sought by plaintiffs would be T-shirts, snow globes or other items on which the Tinker Bell sprite is but one of several characters from a Disney animated feature film. In other words, plaintiffs do not seek to limit their relief to the harm purportedly caused by the alleged encroachment into their market; instead, plaintiffs seek to eliminate the Disney depiction of Tinker Bell from The Disney Store's product repertoire.[13]

---

**12.** At issue in *Kellogg* was Exxon's use of a cartoon tiger in connection with the sale of food items. Kellogg asserted that Exxon's use of the cartoon tiger infringed upon and diluted its trademark rights in "Tony the Tiger." The evidence showed that Exxon had registered its "Whimsical Tiger" mark for use with petroleum products in 1959, about six years after Kellogg had registered its "Tony the Tiger" trademark. It was only after Exxon started to use its cartoon tiger in connection with the sale of food products at Exxon convenience stations, however, that Kellogg brought its trademark infringement case. The Sixth Circuit explained that the doctrine of progressive encroachment "applies in cases where the defendant has engaged in some infringing use of [plaintiff's] trademark—at least enough of an infringing use so that it may attempt to avail itself of a laches or acquiescence defense—but the plaintiff does not bring suit right away because the nature

of defendant's infringement is such that the plaintiff's claim has yet to ripen into one sufficiently colorable to justify litigation." 209 F.3d at 570. The court held that the point in time when Exxon began using its cartoon tiger in the non-petroleum market, and not when Exxon used its mark in connection with petroleum products, was the relevant fact for assessing the defense of laches.

**13.** During the course of the oral argument on the preliminary injunction motion, I questioned plaintiffs' counsel as to the breadth of the relief being sought, asking whether the appearance of the Disney depiction of Tinker Bell on a T-shirt, without more, infringed plaintiffs' mark. Plaintiffs' counsel answered in the affirmative. Plaintiffs then confirmed the extraordinary breadth of the preliminary injunctive relief being sought by submitting on November 22, 2000, approximately one month after the oral argument was conduct-

Finally, the evidence in this case does not support a finding of progressive encroachment in the context of plaintiffs' broad claims. As detailed above, Disney and its affiliates have long used its depiction of the Tinker Bell sprite on and in connection with a wide variety of products. In particular, since 1987 The Disney Store has marketed Tinker Bell items that plaintiffs now claim infringe their mark, such as costumes, wands, watches, children's apparel, toys, swimwear, children's sleepwear, note cards, etc. (*See* Declarations of Rebecca Cline and Brigid McDonough.) Thus, this is not a case where plaintiffs' claims matured shortly before the filing of this action. Instead, The Disney Store has made extensive use of its depiction of Tinker Bell character to sell products since its inception.

■ Even if consideration of the effect of plaintiffs' delay is limited to the period after the end of October, 1999, when plaintiffs concede knowledge of The Disney Store marketing and sales of allegedly infringing products, plaintiffs' failure to act sooner than it did undercuts the sense of urgency that typically accompanies a motion for preliminary injunctive relief. In this regard, a cease and desist letter was not sent until approximately two months after plaintiffs' in-house counsel had conducted an investigation and concluded that The Disney Store was selling infringing products. The President of New Tinker-

bell acknowledged that the last communication with respect to settling the matter occurred around March 1, 2000. Plaintiffs proffered no documentation of settlement negotiations that continued beyond March 1, 2000.[14] It has been recognized that, in the trademark infringement context, "courts typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months." *Gidatex*, 13 F.Supp.2d at 419. In this case, there is an unexplained delay of two months in presenting a cease and desist letter, and another unexplained delay of five months in moving for injunctive relief. Under these circumstances, plaintiffs' delay, alone, precludes a finding of irreparable harm, and therefore warrants denial of the preliminary injunction motion concerning The Disney Store Tinker Bell-related products.[15]

■ Even if plaintiffs' delay did not preclude the grant of preliminary injunctive relief, they have failed to establish a reasonable likelihood of prevailing on the merits to the extent of the relief they seek by way of preliminary injunction. To prevail on a trademark infringement claim, a plaintiff must show: (1) the name is valid and legally protectable; (2) the plaintiff has a right to the mark; and (3) defendant's use of the name to identify goods and services is likely to create confusion concerning the origin of the goods or ser-

ed, a proposed order that made it clear that the only products not within the ambit of plaintiffs' claims were those "which are, by themselves, exact replicas of Disney's copyrighted character 'Tinkerbell.'" Thus, only such items as figurines, or perhaps, drawings of the Disney character appear to be outside the scope of plaintiffs' claims in this case.

14. Thus, this case is unlike *Times Mirror, supra*, in which the district court found that a 15-month delay in bringing action did not preclude a finding of irreparable harm because the delay was attributable to negotiations between the parties. 212 F.3d at 169.

15. Plaintiffs suggest that it was the introduction of The Disney Store's pre-teen line in July of 2000 that prompted it to take action. This

line was, indeed, similar to the plaintiffs' product line. Moreover, The Disney Store appeared to have used the words "Tinker Bell" more prominently than had been the case in the past. For several reasons, these facts do not warrant preliminary injunctive relief. First, it is undisputed that The Disney Store discontinued the pre-teen line. Second, plaintiffs' requested relief is not limited to the pre-teen line. Nor is plaintiffs' requested relief constrained to the use of the word "Tinkerbell." Finally, The Disney Store pre-teen line did not use the name "Tinkerbell" alone, but always used an image of Disney's depiction of the animated movie character. Thus, the brief existence of the discontinued product line does not provide a basis for the sweeping preliminary injunctive relief sought here.

vices. *Fisons Horticulture, Inc. v. Vigoro Industries, Inc.*, 30 F.3d 466, 472 (3d Cir. 1994). There is no dispute that plaintiffs are the successor in interest to the Tinkerbell ® mark. For purposes of analysis, it will be assumed that the Tinkerbell ® mark is valid and legally protectable. It is undisputed, however, that plaintiffs have not registered as a trademark a depiction of the Tinker Bell fictional character. Furthermore, plaintiffs have not shown that use of the Disney image by The Disney Store on products is likely to create confusion concerning the origin of those products.

 Likelihood of confusion exists "when consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Pappan Enterprises, Inc. v. Hardee's Food Systems, Inc.*, 143 F.3d 800, 802 (3d Cir.1998). The Third Circuit has indicated that district courts may consider a number of factors in determining the likelihood of confusion, regardless of whether the goods in question were competing or non-competing. *See A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 212 (3d Cir.2000). The factors to be considered include:

(1) degree of similarity between the owner's mark and the alleged infringing mark;

(2) the strength of the owner's mark;

(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of time the defendant has used the mark without evidence of actual confusion arising;

(5) the intent of the defendant in adopting the mark;

(6) the evidence of actual confusion;

(7) whether the goods, though not competing, are marketed through similar channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of consumers because of the similarity of function; and

(10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

*Id.* at 211.[16]

 To the extent that plaintiffs complain of the use of the Disney character, there is no similarity between plaintiffs' registered trademark and the Disney character. The test for determining whether a mark is similar is "'whether the labels create the same overall impression when viewed separately.'" *Fisons*, 30 F.3d at 476. Marks are confusingly similar if ordinary customers would likely conclude that the products share the same source, affiliation, connection or sponsorship. Moreover, marks must be examined in the context in which they are found, considering "'the totality of factors that could cause confusion among prospective purchasers.'" *Villanova University v. Villanova Alumni Educational Foundation, Inc.*, 123 F.Supp.2d 293, 305 (E.D.Pa.2000) (*quoting Gruner + Jahr USA Publishing v. Meredith Corp.*, 991 F.2d 1072, 1078 (2d Cir. 1993)). Plaintiffs' mark consists of the word Tinkerbell. The predominant figure on products sold by The Disney Store is Disney's depiction of the Tinker Bell character. When viewed separately, the labeling on the products does not create the same overall impression. The Disney Store products evoke the image of the movie Peter Pan and the pixie character "with attitude." The Disney character does not conjure up the notion that the products originate with plaintiffs.

**16.** As explained in *A & H Sportswear,* none of these factors is necessarily dispositive. Nor is each factor necessarily relevant in each case. 237 F.3d at 215.

Further militating against a finding of a likelihood of confusion is the nearly 50 year use of the alleged infringing mark without evidence of actual confusion. The goods in question are sold only at The Disney Stores, which has an unmistakable affiliation with Disney as the source of the products. Finally, the evidence was unrefuted that all Disney products bear an image of a Disney character. The Tinker Bell-related products are no exception. Representatives of the defendant explained that The Disney Store exploits the strong affinity that consumers have with Disney characters. There was no evidence that any consumer purchased a product from The Disney Store that bore an image of Tinker Bell on the misunderstanding that the product originated with plaintiffs. In short, a consideration of the pertinent factors compels the conclusion that, in the context of the relief sought in this case, plaintiffs have not established a likelihood of confusion.[17]

### B. The Anti–Dilution Claim with Respect to the Tinkerbell Mark

■ Dilution of a trademark occurs when a new and larger company adopts the same or similar trademark of a smaller, senior company, causing confusion as to the source of the senior user's goods and services. As the court in *Ameritech*

*Inc v. American Info.*, 811 F.2d 960 (6th Cir.1987), explained:

> [T]he junior user saturates the market with a similar trademark and overwhelms the senior user. The public comes to assume the senior user's products are really the junior user's or that the former has become somehow connected to the latter. The result is that the senior user loses the value of the trademark—its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets.

*See also Fisons*, 30 F.3d at 474.

■ To establish a prima facie case of trademark dilution, a plaintiff must establish that (1) it is the owner of a mark that qualifies as a famous mark under 15 U.S.C. § 1125(c)(1); (2) the defendant is making a commercial use in interstate commerce of a mark or trade name; (3) defendant's use began after the plaintiff's mark became famous; and (4) defendant's use causes dilution by lessening the capacity of the plaintiff's mark to identify and distinguish goods and services.[18] *Times Mirror*, 212 F.3d at 163.

■ The plaintiffs are arguing dilution by blurring. (Plaintiffs' Reply Brief at 27.) "Dilution by blurring occurs where the defendant uses or modifies the plaintiff's

---

**17.** I have not undertaken a separate analysis of Disney's use of the terms "Tinkerbell," "Tinker Bell," and "Tink" because plaintiffs' requested preliminary injunctive relief is not limited to removing these words from products sold by The Disney Stores. Clearly, the use of the word Tinkerbell alone would appear to infringe plaintiffs' mark. On the other hand, the use of the word Tink, alone, would not appear to be infringing, and when coupled with the Disney character, would not prompt thoughts that the products originate with plaintiffs. Use of the words Tinker Bell without the image would appear to fall on the side of infringement, whereas use of the words Tinker Bell with the Disney image and the word Disney would appear to fall on the side of non-infringement. As noted above, the Disney depiction of the Tinker Bell character appears on all its products, and plaintiffs seek to prohibit the sale of all products

bearing the image. Given the procedural posture of this case and the breadth of relief sought, there is thus no need at this time to address the question of whether Disney's use of the words "Tinkerbell" or "Tinker Bell" along with the Disney image is likely to infringe plaintiffs' mark as plaintiffs are not entitled to the expansive relief they request.

**18.** 15 U.S.C. § 1125(c)(1) provides:

> The owner of a famous mark shall be entitled to, subject to the principles of equity, and upon such terms as the court deems reasonable, an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection.

trademark to identify the plaintiff's goods and services, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product." *Hormel Foods Corp. v. Jim Henson Productions Inc.*, 73 F.3d 497, 506 (2d Cir. 1996); *see also Times Mirror*, 212 F.3d at 168. "Blurring further entails confusion in that the famous and junior marks become wrongly and mistakenly ·associated in the minds of the consumer." *Ringling Brothers–Barnum & Bailey Combined Shows Inc. v. Utah Div. of Travel Development*, 955 F.Supp. 605, 616 (E.D.Va.1997), *aff'd* 170 F.3d 449 (4th Cir.), *cert. denied*, 528 U.S. 923, 120 S.Ct. 286, 145 L.Ed.2d 239 (1999).

■ To determine blurring, the court in *Times Mirror* utilized factors identified in *Mead Data Central Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026, 1035 (2d Cir.1989), and *Nabisco Inc. v. PF Brands Inc.*, 191 F.3d 208, 217–22 (2d Cir.1999). The factors include:

(1) similarity of the marks

(2) similarity of the products covered by the marks

(3) sophistication of the consumers

(4) predatory intent

(5) renown of the senior mark

(6) renown of the junior mark

The other factors set forth in *Nabisco* include: distinctiveness, actual confusion and likelihood of confusion, shared customers and geographic location, harm to junior user; delay by senior user, and duration of junior use.

■ As noted above, in the context of plaintiffs' expansive claims, plaintiffs' mark and the Disney depiction of Tinker Bell are dissimilar. The products covered by Disney's image of Tinker Bell are much more extensive than plaintiffs' product line. Plaintiffs' claims of predatory intent on the part of The Disney Store are dis-

pelled by the unrefuted evidence that all Disney products sold by The Disney Store bear the image of Disney characters. Customers of The Disney Store expect to be able to purchase products bearing an image of a Disney character with whom the customers have an affinity. Moreover, the lengthy delay in bringing action precludes a finding that plaintiffs are likely to prevail on their claim of dilution by blurring. Thus, plaintiffs have not shown a likelihood of prevailing on their anti-dilution claim.[19]

C. *The Heaven Scent Trademark*

■ The Disney Store did not begin selling products bearing the words "Heaven Scent" until July of 2000. Thus, delay is not a factor in assessing plaintiffs' entitlement to injunctive relief. Nonetheless, plaintiffs are not entitled to a preliminary injunction because The Disney Store has discontinued its pre-teen line in which this product appeared. No evidence was presented to suggest that The Disney Store was continuing to sell products that contained the words "Heaven Scent." Moreover, the marks in question were not confusingly similar. Plaintiffs' mark predominantly displays the words "Heaven Sent." The Disney Store, on the other hand, only marketed its product as part of a package with three other containers inside a box. The predominant name on each bottle in the box was "Pixie Glam," with the image of the Tinker Bell character and, in smaller letters, the words, "Heaven Scent." According to the Declaration of Mitchell E. Hurst, the words "Heaven Scent" were chosen by a supplier of the boxed set of children's bath and cosmetic type products. Approximately 8,000 units of the boxed set were purchased for sale in North America. As noted above, that product has been discontinued, and Mr. Hurst asserts that

---

**19.** For the reasons noted above in footnote 17, a separate analysis of the use of the words "Tinkerbell," "Tinker Bell," and "Tink" will not be undertaken. It should also be noted that, in any event, plaintiffs' delay in asserting an anti-dilution claim precludes a finding of irreparable harm necessary for entry of preliminary injunctive relief.

The Disney Store has no intention to purchase any cosmetic products bearing the descriptive term Heaven Scent in the future. Under these circumstances, preliminary injunctive relief is not warranted.

**IV.** *Conclusion*

For the foregoing reasons, plaintiffs' motion for a preliminary injunction will be denied. An appropriate Order is attached.

## APPENDIX A

## ORDER

NOW, THIS 29th DAY OF JANUARY, 2001, for the reasons set forth in the foregoing Memorandum, **IT IS HEREBY ORDERED THAT:**

1. Plaintiffs' motion for preliminary injunction (Dkt. Entry 3) is **DENIED.**

2. Plaintiffs' motion to strike (Dkt. Entry 77) is **DENIED.**

3. A scheduling conference will be conducted on **Thursday, February 22, 2001 at 1:30 p.m.**